# DETROIT v. DETROIT CITIZENS' STREET RAILWAY COMPANY.

### APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 152. Argued November 4, 5, 1901.—Decided March 3, 1902.

The Detroit Citizens' Street Railway Company, at the time this action was commenced, was operating upwards of one hundred and thirty-five miles of street railways in Detroit, under grants and permissions made by the city government of Detroit, and by the statutes of Michigan set forth in the statement of facts and in the opinion of the court in this case. This litigation arises out of the different constructions placed by the parties upon the statutes of Michigan, called respectively the Tram-railway Act, and the Street-railway Act, both in force when said company acquired its powers. The provisions made by those statutes are summed up in the statement of facts. *Held:*

(1) That this was not such a case as on its face equity could have no jurisdiction over, and that, considering the public interests involved, a case is made out for following the general rule that a defence of want of equity jurisdiction will not be recognized where it has not been taken by answer, or in any other manner, and is not insisted upon on the hearing before the court;

(2) That there can be no question in this court as to the competency of a state legislature, unless prohibited by constitutional provisions,

to authorize a municipal corporation to contract with a street railway company as to the rate of fares, and so to bind, during the specified period, any future common council from altering or in any way interfering with such contract;

(3) That such a contract having once been made, the power of the city over the subject, so far as altering the rates of fare or other matters properly involved in and being a part of the contract, is suspended for the period of the running of the contract;

(4) That binding agreements had been made and entered into, between the city on the one side and the companies on the other, relating to rates of fare, and such agreements could not be altered without the consent of both sides;

(5) That those binding agreements constituted a contract as to the rates, equally binding with that in regard to taxes;

(6) That the rate of fare having been fixed by positive agreement, under express legislative authority, the subject was not open to alteration thereafter by the common council alone, under the right to prescribe from time to time the rules and regulations for the running and operation of the road;

(7) That the language of the ordinance which provides that the rate of fare for one passenger shall not be more than five cents does not give any right to the city to reduce it below the rate of five cents established by the company;

(8) That the provisions in the Tram-railway Act and the Street-railway Act referred to are entirely harmonious, and may be fully carried out, so as to involve neither incongruity nor inconsistency;

(9) That the extension of the terms of the city's consent beyond the limits of the corporate life of the companies was not illegal and void;

(10) That the fixing of rates, being among the vital portions of the agreement between the parties, it cannot be supposed that there was any intention to permit the common council, in its discretion, to make an alteration which might be fatal to the pecuniary success of the company.

THE bill in this suit was filed by the railway company for the purpose of obtaining an injunction to restrain the city of Detroit and the individual defendants from enforcing certain ordinances of the common council of the city, adopted in 1899, reducing the rates of fare on the various city railways of the complainant and providing for transfers of passengers from one route to another on payment of one fare of five cents, on the ground that such ordinances were violations of the Federal Constitution, because they impaired the obligation of contracts theretofore entered into between the city and the various pred-

ecessors of the complainant. The Circuit Court granted a decree perpetually enjoining the defendants as prayed for, and they have appealed therefrom to this court.

As further ground for equitable jurisdiction, the complainant, after setting up in the bill its alleged contracts with the city, and the attempted violation thereof by the latter, made the following averments:

"Your orator further shows unto the court that as owner and lessee it is now engaged in the operation of upwards of one hundred and thirty-five miles of street railways in the streets of the city of Detroit; that in such operation it has in use upwards of four hundred street cars, which are propelled by electricity, and has in its employ, engaged in such operation, upwards of one thousand men as motormen and conductors; that it carries an average of———thousand passengers per day over the lines owned and operated by it; that under and by virtue of the provisions of said ordinances, Exhibits A, B, C, D and E and the obligation of your orator to carry such passengers as may offer themselves for carriage, it will be subjected to innumerable demands upon the part of the travelling public to sell to such persons as may make such demands tickets in accordance with the provisions of said ordinances, Exhibits A, B, C, D and E, and to issue as provided and required thereby, and to accept and carry such passengers and transfer the same at the rates of fare fixed by said ordinances; that on your orator's refusal to comply with such demands and requests your orator may be subjected to numerous actions at law by persons so refused, and to annoyance, litigation and loss by reason thereof; that the said city of Detroit will seek and now seeks and threatens and intends by such power and authority as it may possess and by vexatious legal proceedings to compel your orator to comply with the provisions of said ordinances, Exhibits A, B, C, D and E, and as a result your orator will be put to great loss, damage, hindrance and annoyance in the transaction of its business, which it is entitled to carry on without such suits, litigation, actions, annoyance, hindrance, loss and damage.

"That, in full reliance upon its right to charge the full rates of fare fixed by the various contracts and grants hereinbefore

referred to, and for the purpose of procuring such money as it was necessary that it should have for the construction, maintenance, repairing, and reconstruction and operation of the various lines of railway hereinbefore described, it issued its bonds and borrowed thereon the money so needed; that your orator and its predecessors and lessors have issued for the purposes aforesaid bonds amounting in the aggregate to eight million two hundred thousand dollars, payable in gold coin, with semi-annual interest at the rate of five per cent per annum; that many of said bonds mature and will be due and payable within the next three years, and it will be necessary for your orator to borrow a considerable amount of money to assist in the payment and retirement of said bonds, by the issue of bonds of the same character; that all of said bonds outstanding are secured by mortgages given at various dates, by the terms of which all of the property, rights, privileges and franchises of your orator, its lessors and predecessors, including the franchises or rights fixed by the said various contracts and grants to charge the rates of fare therein named, together with all the tolls, fares, issues, earnings and profits arising therefrom, have been mortgaged to trustees therein named for the use and benefit and security of the holders of such bonds; that said bonds have been sold to parties purchasing the same in the full faith and belief that your orator, its lessors and predecessors and grantors, had the right to charge the full rates of fare fixed by the various contracts and grants without any right upon the part of the said city of Detroit, or of any other person, corporation, or authority to interfere with, lessen, reduce or impair the same, and, the said right to have and receive the rates of fare so fixed being so mortgaged as a part of the security for the payment of said bonded indebtedness, the action of said city by the adoption of the ordinances, Exhibits A and B, is an impairment of the obligation of said contract as against the rights of said bondholders under and by virtue of the security created by said various mortgages and in contravention of said section 10 of article 1 of the Constitution of the United States."

Complainant also averred in its bill the granting of consent by the city to its predecessors to lay tracks in the streets and

charge tolls at the rates named in certain ordinances, for transporting passengers, and the due assignments by the various companies of all such rights, by purchase or lease to the complainant, and the defendant by its answer makes no issue as to the validity of such assignments or the ownership by complainant of all the interests of the former companies in the contracts and ordinances set forth in the bill.

The answer admits the passage by the common council of the ordinances of 1899, reducing the rates of fare on the roads operated by the complainant, and also admits that the city intends to compel the complainant to comply with the provisions of such ordinances, which the defendants aver are valid because, as they claim, the former ordinances did not constitute a contract as to rates of fare which could not be altered by the city.

This litigation arises out of the different constructions placed by the parties upon the statutes of Michigan, called respectively the Tram-railway Act and the Street-railway Act, and the various amendments of those acts, and also out of the different claims of the parties as to the character and validity of the ordinances passed by the common council subsequently to the passage of those statutes.

The Tram-railway Act was passed in 1855, and the Street-railway Act in 1867. Prior to the amendment in 1861, made to the former act, there was no authority for the incorporation of street railways, and in the year named that act was amended by adding sections 33 and 34, which are as follows:

"SEC. 33. It shall be competent for parties to organize companies under this act to construct and operate railways in and through the streets of any town or city in this State.

"SEC. 34. All companies or corporations formed for such purposes shall have the exclusive right to use the same and operate street railways constructed, owned or held by them: Provided, however, that no such company or corporation shall be authorized to construct a railway under this act through the streets of any town or city without the consent of the municipal authorities of such town or city, and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe."

In 1867 the above section 34 was further amended by adding an additional proviso, as follows :

" Provided further, that after such consent shall have been given and accepted by the company or corporation to which the same is granted, such authorities shall make no regulations or conditions whereby the rights or franchises granted shall be destroyed or unreasonably impaired, or said company or corporation be deprived of the right of constructing, maintaining and operating such railway in the streets in such consent and grant named pursuant to the terms thereof."

These sections of the Tram-railway Act, it will be seen, made no special provisions as to rates of fare, and there were no other sections of the act which did.   The last amendment, above set out, of section 34 was passed March 27, 1867, or twenty-two days after the passage of the original Street-railway Act, March 5, 1867.

The provisions of the Street-railway Act material in this controversy are as follows :

" Sec. 13. Any street railway corporation organized under the provisions of this act may with the consent of the corporate authorities of any city or village given in and by an ordinance or ordinances duly enacted for that purpose and under such rules, regulations and conditions as in and by such ordinance or ordinances shall be prescribed, construct, use, maintain and own a street railway for the transportation of passengers in and upon the lines of such streets and ways in said city or village as shall be designated and granted from time to time for that purpose in the ordinance or ordinances granting such consent, but no such railway company shall construct any railway in the streets of any city or village until the company shall have accepted in writing the terms and conditions upon which they are permitted to use said streets ; and any such company may extend, construct, use and maintain their road in and along the streets or highways of any township adjacent to said city or village upon such terms and conditions as may be agreed upon by the company and the township board of the township, which agreement and the acceptance by the company of the terms thereof shall be recorded by the township clerk in the records of his township.

" Sec. 14. After any city, village or township shall have consented as in this act provided to the construction and maintenance of any street railways therein, or granted any rights and privileges to any such company, and such consent and grant have been accepted by the company, such township, city or village shall not revoke such consent, nor deprive the company of the rights and privileges so conferred.

" Sec. 15. Any street railway company may also purchase and acquire at public or private sale, whether judicial or otherwise, or may hire any street railway in any city, village or township owned by any other corporation or company, together with the real and personal estate belonging thereto, and the rights, privileges and franchises thereof, and may use, maintain and complete such road, and may use and enjoy the rights, privileges and franchises of such company and upon the same terms as the company whose road and franchises were so acquired might have done. Every railway company may also purchase, hold, own or take upon lease such real estate, barns, stables, buildings, fixtures and property as may be necessary for the use and business of their road; and the whole or any part thereof, together with their railway fixtures, property and appurtenances, rights, privileges and franchises, may sell, lease, dispose of, pledge or mortgage whenever the corporation may deem it expedient so to do."

" Sec. 20. The rates of toll or fare which any street railway company may charge for the transportation of persons or passengers over their road shall be established by agreement between said company and the corporate authorities of the city or village where the road is located, and shall not be increased without the consent of such authorities.

" Sec. 29. All companies and corporations heretofore organized in this State for the purpose of building and operating street railways under the statutes then in force shall have the same powers, rights, protection and privileges and shall be subject to all of the liabilities as are hereby provided for companies and corporations organized under the provisions of this act."

Section 30 in substance provides that all companies and corporations thereafter formed for street railway purposes must be organized under this act.

Some of the railroads of which the complainant is the owner or lessee were organized under the Tram-railway Act and some were organized under the Street-railway Act of 1867. The Detroit Street Railway Company, now owned by the complainant, was organized under the Tram-railway Act, and the city adopted an ordinance assenting to the laying of tracks through the designated streets of the city on November 24, 1862. Section 1 of the ordinance provides:

"Sec. 1. That consent, permission and authority is hereby given, granted and duly vested in Eben N. Wilcox and his associates, who may be approved by the council, their successors and assigns, organized into a corporation, under the laws of the State of Michigan, as aforesaid, to lay a single or double track for a railway, with all the necessary and convenient tracks for turnouts, side tracks and switches, in and along the course of the streets of, and bridges in, the city of Detroit, hereinafter mentioned, and the same to keep, maintain and use, and to operate thereon railway cars and carriages, during all the term hereinafter specified and described, and in the manner and upon the condition set forth in this ordinance."

The following sections then provide for the streets in which the rails are to be laid, the manner of laying, whether double or single track, and various other matters not essential to enumerate.

Section 8 reads as follows: "The rate of fare for any distance shall not exceed five cents in any one car, or on any one route named in this ordinance, except where cars or carriages shall be chartered for specific purposes: Provided, cars so chartered shall not be considered regular cars, within the meaning of the preceding section."

Section 20 limits the powers and privileges conferred by the ordinance to thirty years from and after the date of its passage.

On November 14, 1879, an ordinance was passed supplementary to the one passed on November 24, 1862, which provided for extensions by the railway company of its tracks through various other streets of the city, and also provided, among other things, for a special tax on the gross receipts of the several lines of railway operated by the company, payable to the city, which

tax was to be in lieu of license or other taxes and charges under the existing ordinances.

Section 5 of the supplemental ordinance provided that the powers and privileges conferred and the obligations imposed on the railway company, by the ordinance passed November 24, 1862, and the amendments thereto, should be thereby extended and limited to thirty years from date, (November 14, 1879).

Section 6 provided that the ordinance should take immediate effect when written acceptances of the terms thereof were filed in the office of the city clerk of Detroit by the different companies controlled by the Detroit City Company; and it also provided that all ordinances or parts of ordinances in conflict with the provisions thereof were thereby repealed; and all ordinances and parts of ordinances not in conflict therewith were thereby affirmed and continued in force. The acceptances were subsequently duly filed in the city clerk's office.

A similar ordinance to that of November 14, 1879, was passed on June 30, 1880, relative to the Fort Wayne and Elmwood Street Railway Company, confirming and extending for thirty years its grant under the ordinance of January 31, 1865. Similar ordinances were passed in favor of other lines which had been organized under the Tram-railway Act and its amendments.

And ordinances of the same nature were passed relating to the companies organized under the Street-railway Act of 1867.

The original ordinance under which the city gave consent to the laying of the rails of the Grand River Street Railway was adopted on May 1, 1868, and the section providing for the rate of fare is the same in language as section 8, in the foregoing ordinance relative to the Detroit Street Railway.

The ordinance relating to the Dix Avenue Railway provided in section 6 " that the rate of fare for a single trip shall not exceed five cents for any distance within the city limits." Similar language was used in section 5 of the ordinance approved by the common council July 13, 1886, relating to the Highland Park Railway. The eighth section of the ordinance approved by the common council January 31, 1868, with regard to the Fort Wayne and Elmwood Railway Company, provides that

" the rate of fare for any distance shall not exceed five cents in any car."

These ordinances embrace the various railroads now owned or leased and operated by the complainant, and it is in them, taken in connection with the statutes already referred to, that the complainant finds the contracts or agreements as to the rate of fare, the obligation of which agreements it avers is impaired by the later ordinances passed in 1899.

The charter of the city of Detroit, approved June 7, 1883, by sections 121 and 122, clothed the common council with power over the streets, highways and alleys, to establish, open, widen, extend, straighten, alter, vacate, etc., and generally to control and regulate the manner in which the highways and streets, avenues, lanes, alleys, public grounds and spaces within the city should be used and enjoyed.

The constitution of the State of Michigan, article 15, section 1, provides that—

" Corporations may be formed under general laws, but shall not be created by special act, except for municipal purposes. All laws passed pursuant to this section may be amended, altered or repealed."

The various ordinances which have been referred to contain certain reservations of the right to alter, etc., which are thus worded : Section 19 of the grant of November 24, 1862, to the Detroit City Railway is as follows :

" It is hereby reserved to the common council of the city of Detroit the right to make such further rules, orders or regulations as may from time to time be deemed necessary to protect the interest, safety, welfare or accommodation of the public in relation to said railways."

Section 7 of the grant of November 14, 1879, reënacting and extending the grant of November 24, 1862, is as follows :

" The right to amend or repeal this ordinance in case of its violation by said company or companies is expressly reserved."

Section 3 of the grant of January 5, 1885, authorizing the Brush street line, is as follows :

" It is hereby reserved to the common council of the city of Detroit the right to make such further rules, orders or regula-

tions as may from to time be deemed by the common council necessary to protect the interest, safety, welfare or accommodation of the city and public in relation to said railway."

Section 3 of the Trumbull avenue line grant of July 31, 1865, is a literal copy of the one last quoted.

Section 18 of the grant to the Grand River Street Railway of May 1, 1868, is as follows:

" It is hereby reserved to the common council of the city of Detroit the right to make such further rules, orders or regulations as may from time to time be deemed necessary to protect the interest, welfare or accommodation of the public in relation to said railways."

The same reservation was contained in section 4 of the grant of June 27, 1885, of the Myrtle street route.

And section 3, of the grant of August 3, 1888, relating to the Grand River line, is the same.

Section 19, of the grant of January 31, 1865, to the Fort Wayne & Belle Isle Company is as follows:

" It is hereby reserved to the common council of the city of Detroit the right to make such further rules, orders or regulations as may from time to time be deemed necessary to protect the interest, safety, welfare or accommodation of the public in relation to said railways."

*Mr. Timothy E. Tarsney* for appellants.

*Mr. John C. Donnelly* and *Mr. Henry M. Duffield* for appellee. *Mr. Michael Brennan* was on Mr. Donnelly's brief.

*Mr. F. A. Baker* filed a brief for appellee.

MR. JUSTICE PECKHAM, after making the foregoing statement of facts, delivered the opinion of the court.

A question has arisen at the outset as to the jurisdiction of a court of equity over a case like the one now presented. Assuming the right to relief in some form, has the complainant a plain and adequate remedy at law, or is the case such in its na-

ture and in the relief demanded as would be cognizable in a court of equity? The foundation of the right of action lies in the alleged invalidity of the ordinances of 1899, reducing the rates of fare on the railways of the complainant, because, as averred, those ordinances are in violation of the Federal Constitution, as impairing the obligation of contracts between the parties already existing, and therefore the claim is made that they should not be permitted to be enforced against the complainant where such enforcement might result in a multiplicity of suits, or in harassing and expensive litigation.

The averments in the complainant's bill upon this subject, which are set forth in the above statement of facts, show the additional and special grounds upon which the jurisdiction in equity is invoked. Of course, if the complainant obey these ordinances, no controversy can arise, but if in good faith it believe them to be invalid and hence not binding upon it, and without resorting to the courts for equitable relief, it refuses to obey them, the consequences may be not only embarrassing but may lead to much unnecessary and expensive litigation. Continuous demands for the tickets mentioned in the ordinances at the reduced price therein provided for may be made by passengers while in the cars of complainant, and they may refuse to pay fare at the old rate, and may carry such refusal to the point of suffering removal from the cars on account of nonpayment of fare. What amount of force would be necessary in the opinion of the various passengers to demonstrate that their going was not voluntary would of course give rise to disputes between them and the conductors, and would possibly, if not probably, lead to frequent breaches of the peace in the course of these attempts at removal. If not removed, then the passengers would either pay no fare or the complainant would have to accept the fare as provided in the ordinances of 1899, and that would be the same in fact as submitting to their enforcement.

The roads operated by complainant are also indebted to an extent of over eight million dollars, secured by mortgages upon the railways, their franchises, rights and privileges, together with the tolls and fares, earnings and profits arising therefrom,

and some of this indebtedness is soon to mature, and it is admitted that the bonds issued as evidence of such indebtedness and secured by its mortgages were so issued and sold to and purchased by the holders thereof in the full faith and belief that the various roads represented by the complainant had the right to charge the rates of fare fixed by the ordinances already mentioned; such belief being based upon the existence and terms of such ordinances.

The ability of the complainant to renew or extend its mortgage indebtedness might depend upon belief in the validity of the contracts as to the rates of fare agreed upon before the attempted alteration thereof by the ordinances of 1899. The immediate enforcement of these later ordinances might result in such a decrease of income as to seriously imperil the solvency of the complainant. An equitable action like this would certainly be more adequate and offer more effective and immediate relief than for the complainant to await the various actions at law to which it would otherwise be subjected by the defendants and the individuals demanding the reduced rates for transportation.

The mayor and corporation counsel have, as is seen, been joined with the city as defendants in the suit. The reason for the joining of the individual defendants would seem to be that they are the officers upon whom would devolve the execution of the ordinances passed by the common council, and in the answer of the defendants it is admitted that they intend to enforce obedience by the company to such ordinances. The case is similar in some of its aspects to that of *Smyth* v. *Ames,* 169 U. S. 466. It is true there are no penalties fixed in the ordinances for disobedience to their commands on the part of the company, but the bill shows that there are a large number of passengers carried over the roads of the complainant daily, amounting to many thousands, each of whom would have the right to demand transportation at the rates provided for by the ordinances in case they were valid. As is said in *Smyth* v. *Ames,* page 518, " The transactions of a single week would expose any company questioning the validity of the statute to a vast number of suits by shippers, to say nothing of the heavy

penalties named in the statute. Only a court of equity is competent to meet such an emergency and determine, once for all, and without a multiplicity of suits, matters that affect, not simply individuals, but the interests of the entire community as involved in the use of a public highway and in the administration of the affairs of the quasi-public corporation by which such highway is maintained." While this is not such an extreme case, and there are no penalties provided in the ordinances for disobedience, yet the same principle applies.

It is a matter of general public interest, as well as of vital importance to the complainant, that the question involved in this litigation should be determined at the earliest possible moment, and once for all, and thus a multiplicity of suits and other complications prevented.

Taking all these facts into consideration, and bearing in mind that the answer does not set up any defence of the lack of jurisdiction of a court of equity over the subject-matter, and does not insist that there is an adequate and plain remedy at law, (and no such objection has been taken at any time, and has not been insisted upon before us,) we do not feel compelled, under the peculiar circumstances of the case, to ourselves take notice of it.

It is not such a case as on its face equity could have no jurisdiction over, such as an action to recover damages for an assault, or for a libel or slander, but the question between the parties as to the validity of various ordinances and the right of the city to enforce them, involving, as they may, the credit and possibly the solvency of the complainant, and taking into consideration the public interests involved in a speedy and final determination of the question, all these as well as other facts already mentioned, we think, make out a case for following the general rule, that a defence of this nature will not be recognized where it has not been taken by answer or in any other manner and is not insisted upon on the hearing before the court. *Reynes* v. *Dumont*, 130 U. S. 354; *Kilbourn* v. *Sunderland*, 130 U. S. 505; *Brown* v. *Lake Superior Iron Co.*, 134 U. S. 530.

We do not mean to assert that in all cases of this nature, in-

volving simply the validity of a subsequent ordinance or law, a court of equity would be the proper forum, but confine our decision to the special facts of this case, including the fact that no objection has been taken to the jurisdiction of the court at any stage of the litigation, and is not now raised by any party to the same.

This brings us to a consideration of the questions argued at the bar.

In furtherance of the claim by defendants that the ordinances of 1899 reducing the rates of fare are valid, it is urged that express authority from the legislature is required to enable the common council of a city to pass ordinances such as those described in this case, providing for the consent of the city to the laying of tracks and the running and operation of a railroad through its streets and the fixing of rates of fare, and that no such power was granted in this case, and if there were, there has been no agreement made by the passage of the ordinances referred to in the statement of facts. It may be conceded that clear authority from the legislature is needed to enable the city to make a contract or agreement like the ordinances in question, including rates of fare. But there can be no question in this court as to the competency of a state legislature, unless prohibited by constitutional provisions, to authorize a municipal corporation to contract with a street railway company as to the rates of fare, and so to bind during the specified period any future common council from altering or in any way interfering with such contract. *New Orleans Gas Company* v. *Louisiana Light Company*, 115 U. S. 650; *New Orleans Waterworks Company* v. *Rivers*, 115 U. S. 674; *St. Tammany Waterworks* v. *New Orleans Waterworks*, 120 U. S. 64; *Walla Walla City* v. *Walla Walla Water Company*, 172 U. S. 1, 9; *Los Angeles* v. *Los Angeles City Water Company*, 177 U. S. 558, 570; *Freeport Water Company* v. *Freeport City*, 180 U. S. 587, 593. The contract once having been made, the power of the city over the subject, so far as altering the rates of fare or other matters properly involved in and being a part of the contract, is suspended for the period of the running of the contract.

It is, however, urged that the terms employed in the ordi-

nances under which the complainant runs its different lines of street railways are not sufficient to constitute contracts, which may not be altered at the pleasure of the common council. It is said that at least in regard to the ordinances relating to those companies organized under the Tram-railway Act, no contract can be found in them, as there was no special provision in that act for an agreement between the city and a company applying for the use of its streets, as to the rates of fare, and therefore a statement in an ordinance upon that subject would amount to no more than a license which might be altered or revoked at any time; and that if the language were a contract, it was in the power of the common council to alter or abrogate it under section 34 of the Tram-railway Act.

It will be seen that under section 34 of the Tram-railway Act, as it was enacted in 1861, a railway corporation organized under the act could not construct a railway through the streets of a city without the consent of the municipal authorities, "and under such regulations and upon such terms and conditions as said authorities may from time to time prescribe." Hence, it is argued that any terms or conditions under which the railway company obtained the consent of the municipal authorities might by the same authorities be from time to time altered as they should in their discretion think fit.

In *Pingree* v. *Michigan Central Railroad Company*, 118 Mich. 314; also 76 N. W. Rep. 635, decided in 1898, the Supreme Court of Michigan held that section 15 of the laws of 1846, relating to the incorporation of the Michigan Central Railroad Company and other sections mentioned in the act, which provided that the company might fix, regulate and receive tolls taken for the transportation of passengers or property on the railroad subject only to the limitation, as to passengers, of three cents per mile, etc., the company having the power to charge for tolls and transportation such sums as might be lawfully established by the by-laws of the company, and the board of directors having power to pass all by-laws necessary for carrying into execution all powers vested in the company, conferred a contract right on the corporation to fix tolls within the limits of three cents per mile, which right could not be violated by the acts of a succeeding legislature.

There is no provision in the act referred to in the above cited case, of a nature similar to the one in question here, providing for regulations, terms and conditions which might from time to time be prescribed. The case shows, however, that in the opinion of the Supreme Court of Michigan, language similar to that used in the ordinance, (omitting such provision,) amounted to a contract, and the question remaining would be whether the further language contained in the ordinance permitted an alteration of the terms of the contract as the common council might from time to time prescribe. The rate of fare is among the most material and important of the terms and conditions which might be imposed by the city in exchange for its consent to the laying of railroad tracks and the running of cars thereon through its streets. It would be a subject for grave consideration and conference between the parties, and when determined by mutual agreement, the rate would naturally be regarded as fixed until another rate was adopted by a like agreement. Can it be possible that under this language permitting consent upon such terms and conditions as the city might from time to time prescribe, the power was reserved to make a rate of fare which might ruin the whole enterprise? That a rate once deliberately and mutually agreed upon might be thereafter and from time to time altered at the pleasure of the city alone? Will it be believed the parties thus understood the meaning of that provision? It would hardly be credible that capitalists about to invest money in what was then a somewhat uncertain venture, while procuring the consent of the city to lay its rails and operate its road through the streets in language which as to the rate of fare amounted to a contract, and gave the company a right to charge a rate then deemed essential for the financial success of the enterprise, would at the same time consent that such rate then agreed upon should be subject to change from time to time by the sole decision of the common council. It would rather seem that the language above used did not and was not intended to give the right to the common council to change at its pleasure from time to time those important and fundamental rights affecting the very existence and financial success of the company in the operation

of its road, but that by the use of such language there was simply reserved to the city council the right from time to time to add to or alter those general regulations or rules for the proper, safe and efficient running of the cars, the character of service, the speed and number of cars and their hours of operation and matters of a like nature, such as are described in the opinion of the court below in this case. Such would seem to be a reasonable construction of the language. It is unnecessary to conclusively determine the question, because we think that under sections 20 and 29 of the Street-railway Act of 1867, above set out, and by the subsequent adoption of the ordinance of 1879, (set out in the foregoing statement of facts,) relating to the Detroit City Railway Company, (and by the adoption of similar ordinances thereafter with regard to the other companies,) binding agreements were made and entered into between the city on the one side and the companies on the other relating to rates of fare, and such agreements could not be altered without the consent of both sides.

These agreements had express legislative authority, not only under the Tram-railway Act, but also and particularly under the Street-railway Act of 1867. By the twentieth section of the latter act it was provided that the rates of toll or fare, which any street railway may charge for the transportation of persons or passengers over its road, should be established by agreement between the company and the corporate authorities of the city or village where the road is located, and should not be increased without the consent of such authorities. The provisions of this section, among others, were by the twenty-ninth section of the act transferred to " all companies and corporations heretofore organized in this State for the purpose of building and operating street railways under the statutes then in force, and shall have the same powers, rights of protection and privileges and shall be subject to all the liabilities as hereby provided for companies organized under the provisions of this act."

It is plain that the legislature regarded the fixing of the rate of fare over these street railways as a subject for agreement between the parties and not as an exercise of a governmental

function of a legislative character by the city authorities under a delegated power from the legislature. It was made matter of agreement by the express command of the legislature. Ordinances of a like nature/were passed by the common council relating to the other companies, and all of them were accepted in writing and they all had in them provisions relating to, or referred to ordinances providing for, the rate of fare in language similar to the foregoing.

Coming to a consideration of the effect of the language used, we think it amounted to a contract as to rates of fare. The ordinance of 1879 and the similar ordinances thereafter passed relating to the other corporations, together with the Street-railway Act of 1867, and sections 20 and 29 thereof, make out plain agreements entered into between the parties in relation, among other things, to the rates of fare to be charged by those companies. In the ordinance of 1879 and in the other ordinances under consideration, there were provisions made for special taxation of the companies which the Supreme Court of Michigan in *Detroit Citizens' Street Railway Company* v. *Common Council of the City of Detroit*, 125 Mich. 673, has held amounted to a contract between the parties which was as binding as though made by the legislature itself. Such decision by the Supreme Court of Michigan is entitled to very great respect and weight. If the ordinance constituted a contract between the parties in relation to taxes which were to be levied upon the company, we do not see any reason, in the language used providing for the rates of fare, for not holding that there is a contract as to those rates equally binding with that in regard to taxes.

In *City Railway Company* v. *Citizens' Street Railroad Company*, 166 U. S. 557, the common council of Indianapolis, on January 18, 1864, adopted an ordinance which said : " Consent, permission and authority are hereby given, granted to and duly vested in the company organized with R. B. Catherwood as president, a body politic and corporate by the name of the Citizens' Street Railway of Indianapolis, and their successors, to lay a single or double track for passenger railway lines," etc., under which ordinance the railway was built. This court

said (page 567): " The original ordinance of January 18, 1864, was plainly a proposition on the part of the city to grant to the company the use of its streets for thirty years, in consideration that the company lay its tracks and operate a railway thereon upon certain conditions prescribed by the ordinance. This proposition, when accepted by the company and the road built and operated as specified, became a contract which the State was not at liberty to impair during its continuance ; but if, at the expiration of the thirty years, the road had been sold to another company, and that company had applied for and obtained from the common council a franchise to occupy its streets for another period, it seems to be clear that such a contract would need no other consideration to support it than the continued operation of the road under such conditions as the city chose to impose."

Although in that case there was no provision in the statute directing that the rates of fare should be established by agreement, yet nevertheless it was held that the language used amounted to an agreement upon the subject matter which could not be altered during its continuance by either party.

Upon this question considerable stress has been laid in the brief and in the arguments of counsel for the defendants upon the case of *Georgia Railroad & Banking Company* v. *Smith*, 128 U. S. 174. The twelfth section of the charter to that company declared, among other things, that it should have the exclusive right of transportation or conveyance of persons, merchandise, etc., over the railroad to be constructed, and it provided that the charge of transportation or conveyance should not exceed fifty cents per one hundred pounds for heavy articles, and ten cents per cubic foot on articles of measurement for every one hundred miles, and five cents per mile for every passenger. Permission was granted the company to rent or farm out any part of their exclusive right of transportation to any individual on such terms as might be agreed upon. Pursuant to that authority the company leased to one Wadley for the term of ninety-nine years such privileges. Afterwards the legislature of Georgia created a board of railroad commissioners, (Laws of Georgia, 1879, p. 125,) and gave the board power to prevent

railroad companies from charging other than just and reasonable rates. That board prescribed rates for the transportation of freight and passengers by railroad companies in the State which were less than the maximum rates authorized by the twelfth section of the charter of the company above referred to. The question of the validity of this order of the board of commissioners was brought before this court, and it was held that the language of the charter did not justify the holding that, notwithstanding any altered conditions of the country in the future, the legislature had, in 1833, at the time of the grant of the charter, contracted that the company might for all time charge rates for the transportation of persons or property over its line up to the limits there designated. The reasons for so holding are stated by Mr. Justice Field at pages 180 and 181 of the report, and it was not thought that in the exercise of the merely governmental function of creating a charter and incorporating the banking and railway company the legislature had in regard to this particular matter of rates surrendered the right to alter the maximum charges. The language used was regarded as a mere delegation of authority by the legislature to the company to make those charges until the authority was altered or withdrawn. In other words, that the language did not constitute a contract or agreement between the parties, the legislature and the railroad company.

In the case at bar, however, the rates are fixed under the provisions of a statute which declares that they shall be so fixed by agreement between the parties. The ordinance of 1879 adopts that of 1862 and reaffirms it. The rate of fare therein provided is made a rate under the ordinance of 1879, and that ordinance was adopted while the Street-railway Act was in force, and which specially provided for an agreement as to rates of fare, and the provisions of that act were transferred to the companies organized under the Tram-railway Act. It may very well be that language used by a legislature in merely conferring authority upon a company to fix certain charges for fare might not be regarded as amounting to a contract, when the same language used by parties in fixing rates under a legislative authority and direction to agree upon them, would be regarded as

forming a contract because the statute provided specially for that mode of determining them. Under such direction, we are of opinion the language used in the ordinances amounts to an agreement, for that is the way in which the rates are to be arrived ·at, and the reaffirmation of the previous language, by reaffirming and adopting the ordinance of 1862, by the ordinance of 1879, and its acceptance, constitute an agreement as of that time. The same as to the ordinances relative to the other roads. The rate of fare having been fixed by positive agreement under the expressed legislative authority, the subject is not open to alteration thereafter by the common council alone, under the right to prescribe from time to time the rules and regulations for the running and operation of the road.

Nor does the language of the ordinance, which provides that the rate of fare for one passenger shall not be more than five cents, give any right to the city to reduce it below the rate of five cents established by the company. It is a contract which gives the company the right to charge a rate of fare up to the sum of five cents for a single passenger, and leaves no power with the city to reduce it without the consent of the company. The language of section 20 in the Street-railway Act of 1867, which provides that the rate of fare agreed upon shall not be increased without the consent of the city authorities, does not mean that the rate may be reduced without the consent of the railway companies, nor does it show the parties did not suppose there was a contract between them as to rates. That provision does not seem to perform any material function, because without it, the parties having agreed upon the subject of rates, it would follow that the agreement could not be altered by either party without the consent of the other. It may be that it was meant that the company, while unable to increase the rates of fare without the consent of the city authorities, had the right to reduce the rates as it might please without consulting the city.

It was probably inserted from abundant caution, but in no event can it properly or fairly be regarded as an implied permission to the city authorities to reduce the rates of fare as agreed upon without the consent of the railway company. The reasons are obvious and need not be restated.

It is said, however, that section 34 of the Tram-railway Act was amended some twenty-two days after the passage of the Street-railway Act containing the above sections 20 and 29, and that, therefore, the provisions of the amended Tram-railway Act must apply exclusively.

The amendment made to section 34 of the latter act in 1867 has been set forth in the statement of facts above made, but for convenience will be repeated here, as follows:

"Provided further, that after such consent shall have been given and accepted by the company or corporation to which the same is granted, such authorities shall make no regulations or conditions whereby the rights or franchises granted shall be destroyed or unreasonably impaired, or such company or corporation be deprived of the right of constructing, maintaining and operating such railway in the streets in such consent and grant named pursuant to the terms thereof."

Referring to this amendment, it is argued that the city had the right to pass these ordinances of 1899 as a regulation and condition for the operation of the road, unless the rights or franchises already granted to the company should thereby be destroyed or unreasonably impaired, or unless the company would be thereby deprived of the right of constructing, maintaining and operating its railway pursuant to the terms of the original consent, and such impairment is not alleged in the complainant's bill. It is obvious that the additions to the original Tram railway Act made in 1861 and 1867 were laws *in pari materia* with the Street-railway Act passed in 1867, and should therefore be construed together to obtain the legislative meaning.

Bearing in mind the provision of section 29 of the Street-railway Act, granting to other corporations the same powers as are given to the companies organized under that act, and coming to a consideration of the amendment to section 34 of the Tram-railway Act made in 1867, we find no inconsistency or contradiction between the two acts. The amendment to the thirty-fourth section prohibited the city from making any regulations or conditions whereby the rights or franchises of the company should be destroyed or unreasonably impaired, or whereby it

should be deprived of the right of constructing, maintaining and operating its railway pursuant to the terms of the consent, while section 20 of the Street-railway Act provided in terms for an agreement between the parties upon the question of rates of fare, and the parties having fixed such rate by agreement, entered into by authority of the legislature, there can be no question of its binding force.    Section 14 of the same act also safeguarded the rights of the companies, and that section might be referred to in aid of its rights, by the company.    The Tram-railway Act amendment of 1867 is a general provision regarding regulations or conditions, destroying or unreasonably impairing rights or franchises already granted, or depriving the company of rights of construction and operation, and should be construed also in connection with section 14 of the Street-railway Act, while the matter of rates of fare is specially provided for by section 20 of the last named act, which provides for an agreement on that subject.    The two acts are entirely harmonious and may be fully carried out so as to involve neither incongruity nor inconsistency.

But the defendants raise the objection that section 29 of the Street-railway Act cannot be applied to companies formed under any other act for the reason that to apply it to such companies would violate the state constitution, section 20 of article 4, which provides that " no law shall embrace more than one object which shall be expressed in its title."

The title of the Street-railway Act is " An act to provide for the formation of street railways," and the claim is made that the provision of section 29, making the act applicable to other companies, is outside and beyond the object of the act as expressed in its title.

The meaning to be given to the constitutional provision was stated in *People ex rel. Secretary of State* v. *State Insurance Company*, 19 Mich. 392, wherein Chief Justice Cooley, at page 398, said:

" We must give the constitutional provision a reasonable construction and effect.    The constitution requires no law to embrace more than one object, which shall be expressed in its title.    Now, the object may be very comprehensive and still be

without objection, and the one before us is of that character. But it is by no means essential that every end and means necessary or convenient for the accomplishment of the general object should be either referred to or necessarily indicated by the title. All that can reasonably be required is that the title shall not be made to cover legislation incongruous in itself, and which by no fair intendment can be considered as having a necessary or proper connection."

Similar provisions are to be found in the constitutions of several of the States, among them that of New Jersey, and the meaning of such provision was brought before this court in *Montclair* v. *Ramsdell*, 107 U. S. 147, and it was held that the provision did not require a detailed statement or index or abstract of its contents in the title of an act, and that it did not prevent uniting, in the same act, numerous provisions for one general object fairly indicated by its title.

The constitution of Illinois contains a similar provision, the construction of which also came before this court in *Jonesboro City* v. *Cairo &c. Railway Company*, 110 U. S. 192, 198. In that case this court said, through Mr. Justice Harlan:

" The title of the act is ' An act to amend the charter of the Cairo and St. Louis Railroad Company.' The contention is, that the legalization of an election previously held, and at which the people voted in favor of a subscription of stock to that company, and the granting of authority to issue bonds in payment of such subscription, is not a subject expressed by the title of the act. In this view we do not concur, and our conclusion is justified by the later decisions of the Supreme Court of Illinois construing a similar provision in the state constitution of 1870. It was held in *Johnson* v. *People*, 83 Illinois, 431, that the constitution does not require that the subject of the bill must be specifically and exactly expressed in the title; hence we conclude that any expression in the title which calls attention to the subject of the bill, although in general terms, is all that is required."

We have examined the various cases cited by counsel for the defendants, arising in the State of Michigan under the constitutional provision in question, and it is sufficient to say that

we think not one of them extends that provision so as to embrace a case like the one at bar.    Narrowly considered, an act to provide for the formation of street railway companies should contain nothing but provisions relating to their formation and organization, but it would be absurd to hold that the constitutional provision would prevent the introduction into such an act of various details in regard to the corporations after their formation and in regard to their government, operation, regulation and other matters which might be fairly considered as germane to the particular object named in the title of the statute, and hence, we think it would be a most narrow construction of the constitutional provision to hold that under such a title it was incompetent for the legislature to provide that the benefits and obligations conferred and provided for in the act should be made applicable to corporations of a like character already organized and in operation.    It is germane and appropriate to the subject-matter of the act, and to enact under such a title that all companies of the like nature should have the same privileges is fairly within the general object described in the title. This being true, the companies organized under the Tram-railway Act were equally, with those organized under the Street-railway Act, enabled by the express authority of the legislature to enter into a contract for a rate of fare with the city, and when in 1879 and the subsequent years those companies which were organized under the Tram-railway Act entered into further agreements with the city in the way of ordinances, those agreements were valid so far as the objections heretofore considered are concerned, and not subject, in regard to this matter, to alteration at the will of one party only.    The agreements being valid in the case of companies organized under the Tram-railway Act, it follows that those entered into with the other companies organized under the Street-railway Act were also valid.

Still another objection is raised by the defendants to the validity of the ordinances passed in 1879 and 1880 and 1885, by which the powers and privileges conferred and the obligations imposed upon the railway companies by the former ordinances were extended and limited to thirty years from the date of the supplemental ordinances, the objection being that the extending of

the term of the consents beyond the then limit of the corporate life of the companies was illegal and void. We are not of that opinion.

This was matter of agreement between the parties. The franchise to be a corporation came from the State, and all that the company required from the city was its consent to the laying down of the rails and the operation of the road through the streets of the city, and such consent was to be given upon terms and conditions to be agreed on. This consent, when given, became a privilege or franchise granted to the corporation, and was property belonging to it. By the ordinance of 1879 the duties and obligations of the company therein mentioned were largely increased, additional taxes were provided for, and also extensions of its tracks as stated in the ordinance. The company also agreed to furnish all the materials and do all the paving mentioned at its own expense. One inducement to the company to agree upon and accept this ordinance was that the term which the city had originally consented to for the use of its streets by the company should be extended to thirty years from the date of the new ordinance. Although the company itself, by the act under which it was incorporated, was limited in its corporate life to a term of thirty years from the date of its organization in 1862, the extension of the term of consent by the city carried such consent about sixteen years beyond its then corporate life. Of course, no one contends that this extension of the term for the use of the streets of the city in any manner affected the limit of the term of the corporate life of the company, but the limitation of its life did not prevent it from taking franchises or other property, the title to which would not expire with the corporation itself. A corporation whose corporate existence was limited to a term of years could always purchase the fee in property which it needed for the operation of its business. If at the end of its term its life were not extended, the property which it owned was an asset payable to the shareholders after the payment of its debts, and in a case like the present, where the consent was assignable and transferable, particularly by virtue of section 15 of the Street-railway Act above set forth, any company itself having corporate exist-

ence for that purpose, could purchase the outstanding term and operate its road thereunder. We see no reason why the company could not take the extended term as provided for in the ordinance, and it formed a good consideration for the agreement on the part of the company to perform the other obligations contained in the ordinance. This exact proposition has been determined by the Circuit Court of Appeals for the Sixth Circuit in *Detroit Citizens' Street Railway Company & Others* v. *City of Detroit*, 12 C. C. A. 365 ; same case, 64 Fed. Rep. 628. In the course of the opinion of the court in that case, the cases of *People* v. *O'Brien*, 111 N. Y. 1, and *Miner* v. *New York Central Railroad Company*, 123 N. Y. 242, were cited. *People* v. *O'Brien* is one of the leading cases in New York upon that subject, and it was there held that a corporation, although created for a limited period, might acquire title in fee to property necessary for its use, and where the grant to a corporation of the franchise to construct and operate its road in the streets of a city is not, by its terms, limited and revocable, the grant is in fee, vesting the grantee with an interest in the street in perpetuity to the extent necessary for a street railroad ; the rights granted to be exercised by the corporation or whomsoever may lawfully succeed to such rights. In that case the authorities show that a franchise of the above nature is invested with the character of property and is transferable as such, independently of the life of the original corporation. The other case, in 123 N. Y., announces the same doctrine. It is not a new one, and the decisions have all been one way, in favor of the right of a corporation, limited as to the time of its corporate existence, to purchase or acquire by agreement or condemnation property for its use, the title to which it might own in fee.

The case above cited in the Circuit Court of Appeals for the Sixth Circuit, it will be noticed, is between the same parties as the case at bar, and if the judgment therein had been pleaded or put in evidence upon the trial of this action, we cannot now see why it would not have been *res adjudicata* between the parties in this suit upon that question, at least as to the particular road then under discussion.

In *City of Detroit* v. *Ellis, Attorney General*, 103 Michigan,

612, upon an application for a mandamus the decision of the United States Circuit Court of Appeals was regarded as *res adjudicata* of the question in issue in that suit on an application by the city and certain individual citizens for a mandamus to compel the attorney general to file an information in the nature of *quo warranto* to inquire by what right the railway company maintained and used its tracks in the streets after the date named. Without treating the case in the Circuit Court of Appeals as strictly *res adjudicata*, we regard the conclusion arrived at by that court upon the question under discussion as correct, and consequently the objection now urged by the defendants to the validity of the ordinance of 1879 and the other ordinances similar to it cannot be maintained.

The further objection is made that under the power of alteration and repeal, provided for in the constitution of Michigan and under the terms of the various ordinances giving power to the common council in certain cases to provide for further rules and regulations, the right is reserved to the common council to alter the rates of fare provided for in the various ordinances under consideration, as it alone may regard reasonable and just, without the consent of the company.

The constitution of the State of Michigan, article 15, section 1, provides : "Corporations may be formed under general laws, but shall not be created by special act except for municipal purposes. All laws passed pursuant to this section may be amended, altered or repealed." Counsel for the defendants contends "that the regulation of rates of fare or toll upon the street railway is a governmental function, delegated by the legislature of the State of Michigan to the municipalities, and no matter in what form such delegation of power may be exercised, whether by ordinance or an assumed contract, it is nevertheless a law, subject to alteration, amendment or repeal. It has not been the policy of the State of Michigan since the adoption of the present constitution to permit irrevocable legislation. The State cannot do it itself, and if it cannot, surely one of its creatures, like a city, cannot be permitted to do that which its creator is prohibited from doing."

We have already seen that the legislature was competent to

grant to the city of Detroit the right to give its consent to the laying of the tracks of a street railway and the operation of the same in and through its streets upon such terms and conditions as the parties might agree upon.   The grant of this power was not the formation of a municipal corporation, directly or indirectly, either in substance or effect.   The legislative act which granted the power to the city could not be altered, amended or repealed by the latter.   No such power was given to it by the legislature and probably could not even be delegated in any event.   It is sufficient to say that none was attempted. *City Railway Company* v. *Citizens' Railway Company,* 166 U. S. 557, 563.

The legislature has not attempted to interfere with the rights of the street railway companies in Detroit, and hence the extent of its power so to do is not involved in this case.

We are then brought to the question of the reservations in the ordinances themselves.   An examination of them leads us to the conclusion that not one provided or was intended to provide for a power to alter an agreement in relation to the rates of fare entered into between the parties.   The right from time to time to make such further rules, orders or regulations as to the common council may seem proper, cannot be held to extend to the alteration of a contract as to the rate of fare which shall be charged for the transportation of passengers.   We think, as was stated by the court below, that this reservation permitted the city to make further rules or regulations than those contained in the ordinances, in regard " to all matters incident to the construction and operation of the road, such as the location of the tracks in the streets, the placing of switches and turn tables, the repair of the pavement between the tracks, the removal or limitation of the number of tracks, in the interest of public travel, the frequency with which cars should be run for the public convenience, the stopping of cars at street crossings, the use of fenders, the rate of speed to be maintained, the sale of tickets, and generally to details of the conduct and operation of the railway, which experience might show to be necessary, in addition to or in amendment of those specified in the consent, for the protection of life, the accommodation of the pub-

lic, and the avoidance of injury to private property. Such regulations are not invasions of the contract rights of the company and are just and reasonable." *Lake Shore & Michigan Southern Railway Company* v. *Ohio*, 173 U. S. 285, 305.

The fixing of rates is, as we have already said, among the most vital portions of the agreement between the parties contained in the ordinances. It cannot be supposed for one moment, with regard to a right so fundamental in its nature, that there was any intention to permit the common council in its discretion to thereafter make an alteration which might be fatal to the pecuniary success of the company. For the reasons already given, we think the language used does not, in fact, give any such power to the common council. The ordinances of 1899 are, so far as this record shows, the first wherein the common council has assumed to make any change in the rates of fare without the assent of the company to be affected thereby. From 1862 until 1899 there seems to have been no attempt to exercise this alleged power of alteration by the common council without the consent of the railway company. While the rate of fare existed as agreed upon between the city and the railway company, expenditures involving millions of dollars were entered upon, changing the mode of transportation from animal to electric power, and no claim seems ever to have been made on the part of the city of a right of alteration to be exercised in accordance only with its own views of reason and propriety. This in itself is a strong implication of the want of any such power under the various reservations set forth in the foregoing statement of facts and contained in the ordinances specified. But aside from that and considering only the nature of the right itself growing out of the agreement as to fares, we are of the opinion that not one of the reservations of the right to make further rules or regulations could by any fair construction be held to include the right on the part of the city at its own pleasure to reduce the rates of fare agreed upon in those ordinances.

We have thus answered the chief objections of the city to the maintenance of this action. Some others have been made, which we have examined, but do not think it necessary to fur-

ther refer to them than to say they are in our opinion not well founded.

We think the conclusions arrived at by the court below are correct, and its judgment is, therefore,

*Affirmed.*