## BIRMINGHAM WATERWORKS CO. v. CITY OF BIRMINGHAM.

(District Court, N. D. Alabama, S. D.    January 9, 1913.)

No. 229.

1. Courts (§ 102*)—Federal Courts—Composition—Validity of Municipal Ordinance—"State Statute."

An ordinance of a municipality the constitutionality of which is assailed is not a statute of a state within Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1162 [U. S. Comp. St. Supp. 1911, p. 236]) § 266, providing that no interlocutory injunction restraining the enforcement of a state statute shall be granted by any judge of a United States District Court on the ground of unconstitutionality of the statute, unless the application shall be presented to a district judge, and shall be heard by three judges, of whom at least one shall be a Justice of the Supreme Court or Circuit Judge, and the other two may be Circuit or District Judges, etc.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 351, 352; Dec. Dig. § 102.*]

2. Courts (§ 369*)—Federal Courts—Rules of Decision—Decision of State Court.

Where state legislation is assailed in the federal courts as impairing the obligation of contract, the determination by the state courts that there is no contractual right to be impaired is not conclusive on the federal courts, but they will determine for themselves whether contractual rights exist, and whether such rights, if they exist, are impaired by the legislation attacked.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 369.*]

3. Courts (§ 369*)—Federal Courts—State Court Decisions.

Where state legislation is assailed as violative of the contract clause of the federal Constitution and the state courts have upheld the existence of contract rights, such decisions will be followed in the federal courts.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 369.*]

4. Courts (§ 365*)—Federal Courts—Rules of Decision—Municipal Corporation—Powers—State Decisions.

The charter power of a municipal corporation under the laws of the state creating it is a matter for the determination of the state courts, which determination will be followed in the federal courts, unless the construction conflicts with the proper enforcement of the right guaranteed by the laws of the United States.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 950, 952, 955, 969–971; Dec. Dig. § 365.*]

5. Municipal Corporations (§ 226*)—Powers—Welfare Clause—Contract for Water.

Where a municipal corporation was authorized to enact ordinances for the good order and welfare of the city, it was authorized to contract with third persons or corporations to furnish water for the city and its inhabitants.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 645–650; Dec. Dig. § 226.*]

6. CONSTITUTIONAL LAW. (§ 135*)—WATERS AND WATER COURSES (§ 203*)—MU-
NICIPAL SUPPLY—RATES.

A municipal ordinance, granting the right to a water company to fur-
nish water to the city and its inhabitants, provided a flat rate for domes-
tic consumption in dwellings, etc. only varying with the size of each build-
ing, and for all other purposes prescribed a meter rate measured by actual
consumption, varying in price with the amount of daily consumption.
Another provision "further ordained" that from July 1, 1888, the domes-
tic rate should never exceed the schedule of flat rates specified, and that
the company should have the right to charge for water by measurement
at rates not exceeding the average rates named below, "measured water
to be charged as follows," followed by a schedule of meter rates per thou-
sand gallons consumed and the schedule of annual rents for the meters
themselves. Held, that such provision was not intended to prescribe
maximum rates, but fixed the rates that water company was entitled to
charge during the life of the contract, which right was protected by the
contract clause of the federal Constitution.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 380–
387; Dec. Dig. § 135;* Waters and Water Courses, Cent. Dig. §§ 289–
299; Dec. Dig. § 203.*]

7. WATERS AND WATER COURSES (§ 203*) — WATER RATES — REGULATION —
POWER.

In the absence of statutory authority at the time a city entered into a
contract with a water company to furnish water to the city and its citi-
zens, authorizing the city to regulate rates, the city had no such power.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§§.289–299; Dec. Dig. § 203.*]

8. WATERS AND WATER COURSES (§ 203*)—MUNICIPAL WATER SUPPLY—CON-
TRACT—RATES—TERM.

A contract between a city and a waterworks company, fixing absolute
rates to be charged by the water company, held to authorize the company
to charge the rates prescribed for 30 years.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig.
§§ 289–299; Dec. Dig. § 203.*]

9. MUNICIPAL CORPORATIONS (§ 108*)—"GRANT OF FRANCHISE"—ORDINANCE—
REFERENDUM.

Where a city had contracted with a water company to furnish water to
the city and its citizens at specified rates for 30 years, a subsequent ordi-
nance, modifying the original contract and establishing rates different
from those originally specified, constituted a municipal grant of a fran-
chise within a provision of the city's charter requiring such ordinances to
be ratified by a vote of the people, and hence, the people having voted ad-
versely thereon, it never became operative.

[Ed. Note.—For other cases, see Municipal Corporations, Dec. Dig. §
108.*]

In Equity. Suit by the Birmingham Waterworks Company against
the City of Birmingham. On application for a temporary injunction.
Granted.

London & Fitts, of Birmingham, Ala., and Brown, Spurlock &
Brown, of Chattanooga, Tenn., for plaintiff.

M. M. Ullman, Romaine Boyd, and George Huddleston, all of Birm-
ingham, Ala., for defendant.

GRUBB, District Judge. This is an application for a temporary in-
junction to restrain the enforcement of an ordinance of the city of

Birmingham fixing the rates to be charged by the plaintiff for water furnished the inhabitants of the defendant for consumption.

[1] A preliminary motion has been made by the city, the effect of which is to request the District Judge to call in two Circuit Judges to hear the case with him, as provided in section 266 of the Judicial Code of the United States. The federal courts have held that an ordinance of a municipality, the constitutionality of which is assailed, is not a statute of a state within the meaning of that section, and that the section does not apply to a bill seeking an injunction to restrain the enforcement of a municipal ordinance for that reason. The motion is denied. Sperry-Hutchinson Co. v. City of Tacoma (C. C.) 190 Fed. 682; Cumberland Telephone Co. v. Memphis (D. C.) 198 Fed. 955.

Coming to the merits, the ordinance of the city is asked to be restrained upon two grounds: First, that the rates fixed in it are so low as to be confiscatory, and that it violates the fourteenth amendment to the federal Constitution for that reason; second, that it impairs the obligation of a contract entered into between the city and the plaintiff on June 2, 1888, and so violates section 10 of article 1 of the federal Constitution.

The first ground was not stressed upon the hearing by plaintiff's counsel, and there was no sufficient presentation of that phase of the case either in the shape of evidence or argument, to justify a ruling upon it, and its decision becomes unnecessary upon this hearing, in view of the disposition made of the application upon the other ground. The second ground is the one chiefly relied upon by the plaintiff. The position of the plaintiff upon it is that it has a valid contract with the city entered into June 2, 1888, authorizing it to charge, for the unexpired part of the 30-year term of the contract, beginning from July 1, 1888, to the inhabitants of the city, certain fixed and absolute rates therein specified for water furnished either for domestic or manufacturing purposes, and that the ordinance complained of has the effect of reducing the contract rates, and so impairs its obligation. The positions of the defendant are that the city at the time of its execution had no charter authority to make a contract establishing water rates for 30 years, that the contract of June 2, 1888, did not have the effect of fixing absolute rates, but only maximum rates, and that it was for no definite period of time so far as it related to rates. The plaintiff also relied upon a subsequent ordinance of the city, designated 97C, to which it had assented, and which was a modification of the original contract of June 2, 1888, and which established rates differing from those of the original contract, as well as from those of the ordinance complained of, and which was the result of a compromise between the parties to the original contract. The defendant's position, with respect to this subsequent ordinance, is that the charter of the city provided that such contract ordinances should be referred to a vote of the people for ratification or rejection before becoming effective; that the ordinance designated 97C was so referred, and acted upon adversely by the people, and so never became effective. The plaintiff's answer is that it is not one of the class of contracts which the law requires to be submitted to the operation of the referendum, and hence the adverse vote

did not affect its validity. If held to be invalid, then the plaintiff resorts to the original contract of June 2, 1888, as being still in force.

The first question for consideration is the power possessed by the city of Birmingham in June, 1888, to make for its inhabitants a contract for a supply of water for a term of 30 years at fixed and absolute rates, during the contract period, such as is that of June 2, 1888, as it is construed by plaintiff.

[2] Where state legislation is assailed in the federal courts, as impairing the obligation of contract in violation of section 10, article 1 of the Constitution of the United States, the determination by the state courts that there is no contractual right to be impaired is not conclusive upon the federal courts. The federal courts determine for themselves whether contractual rights exist and are impaired by the subsequent legislation. A contrary rule would render this provision of the Constitution ineffectual, since it would be in the power of the state courts to render it inapplicable in any case by determination that no contract right existed to be impaired.

[3, 4] However, when the state courts' construction upholds the existence of contract rights, instead of denying them, no such reason exists for not following the state decisions. The charter power of a municipal corporation under the laws of the state creating it is a matter for the state courts to determine, and the federal courts will follow their construction unless it conflicts with proper enforcement of a right under the laws of the United States.

In the case of Vicksburg v. Vicksburg Water Co., 206 U. S. 496–509, 27 Sup. Ct. 762, 766 (51 L. Ed. 1155), the Supreme Court of the United States said in a similar case to this one:

"In the cases generally in this court it will be found that, in determining the matter of contract, the local decisions have been given much weight, and ordinarily followed. As this is a Mississippi contract, and the power was exercised under an act of the Legislature of that state, we naturally look to the decisions of the courts of that state, particularly to such as had given construction to similar charters at the time the contract was made, with a view to determining the extent of the power conferred."

[5] Under this principle, the Alabama decisions reflecting on the power of the city to enter into the contract of June 2, 1888, should be controlling, when they uphold the power of the city to make the contract. The provisions of the charter of the city in force in June, 1888, relied upon by plaintiff in support of the authority of the city to make the contract of June 2, 1888, are the general welfare clause, and the power to make any needful provisions for the supply of the city with water, gas, and gaslights. Section 20, subds. 1, 10, Act 1880–81, p. 480.

In the case of Greenville v. Greenville Water Co., 125 Ala. 625–639, 27 South. 764, 769, the Supreme Court of Alabama said:

"A supply of water for the extinguishment of fires and other ordinary public uses is one of the necessities of a city, and under the general authority (to enact ordinances for the good order and welfare of the city) so granted the defendant had the power to make a proper contract for such supply."

In the case of Weller v. Gadsden, 141 Ala. 642–656, 37 South. 682, 684, the same court said:

"Whatever may be said as to the agreement to pay for hydrants, at a fixed price, for 30 years, * * * it is settled that under a charter, authorizing a city 'to make needful provisions to supply the city with water' * * * its authorities may make such a contract, which will be valid, if not for the whole period, at least for a reasonable length of time. We so expressly decided in the City of Greenville v. Greenville W. W. Co., 125 Ala. 625 [27 South. 764]."

In the case of Mitchell v. Gadsden, 145 Ala. 137–157, 40 South. 350, the same court, of the same contract, said:

"We hold that the city had the power and authority to enter into said contract, and adopt what was said by Judge Tyson in the cause of Weller v. City of Gadsden, 141 Ala. 642, 37 South. 682, in so far as he treats of the validity of the contract and of its several portions. The making of such a contract is not a delegation of a governmental function, but is an exercise of its business or proprietary powers (citing many cases). The charter of the city of Gadsden, confers ample powers to authorize the making of this contract (Acts 1882–83, p. 290, § 22). At any rate this is one of the incidental powers of a municipal corporation (1 Dillon on Mun. Corp. [4th Ed.] 146, 443, note 1; Livingston v. Pippin, 31 Ala. 542, 550, 551)."

The text of the latest edition of Dillon (3 Dillon [5th Ed.] § 1302, p. 2130) asserts the principle as follows:

"Authority to a city to construct water or gas works, or to provide water or to light the city streets, whether it be derived from an express grant, or from the general power of the city in respect to police regulations, the preservation of public health and the general welfare, confers upon the municipality authority to contract with an individual or corporation for a supply of water or light. Any power which is sufficient to authorize the city to provide a supply of water or light implies, in the absence of special restriction, the power to make a proper contract with an individual or corporation therefor."

From the authorities cited, it is clear that the charter of an Alabama municipal corporation, containing the usual general welfare provisions, and the power to adopt all needful provisions to obtain a water supply for the city, is sufficient to authorize the city to obtain a water supply by contracting, as well as by municipal ownership and operation, though no specific power to obtain it by contract appears in the charter. This was the condition of defendant's charter in June, 1888, and consequently it had the power under it to obtain a water supply by contract, as well as by its own ownership and operation.

[6] The powers to contract for a supply of water and to fix absolute rates to be charged for it during the term of the contract are however, two different things. The question then arising is whether the defendant city had authority, not only to contract for a supply of water for 30 years, but to contract for fixed rates to be paid for the furnishing of the water by the consumer during the same period of time.

In the case of the city of Bessemer v. Bessemer City Waterworks, 152 Ala. 391–405, 44 South. 663, 666, the Supreme Court of Alabama said:

"In the latter category falls the contract we have in hand, and the insistence that the city, even though authorized by the Legislature to bind itself by an irrevocable contract not to regulate water rates, cannot do so, because the power to regulate rates is a continuing legislative power—cannot be sustained (citing many cases)."

In the same case (152 Ala. 407, 44 South. 667), the court said:

"This is but another way of stating the rule that the power of municipal corporations is measured by the legislative grant, and they can exercise such

powers only as are expressly granted, or are necessarily implied from the powers expressly conferred. 1 Dillon (2d Ed.) § 55. With the rule as stated in view, we must determine whether or not the city, under its charter, had the authority contended for by the company and denied by the city, to wit, the authority to contract for rates at which water should be supplied to its citizens for a definite period, and, of consequence, to suspend its charter power in respect to the regulation of rates during such fixed periods. Confessedly the city by the charter is expressly authorized to make all needful provisions *by contract* for a supply of water for itself and *its citizens*, and, in view of section 228 of the Constitution, no objection can be taken to the time period prescribed in the ordinance." (Which was, as in this case, 30 years.)

After discussion, the court concluded (152 Ala. 411–412, 44 South. 668, 669):

"We cannot see that the power to fix rates given in the same section of the charter should be held to be an inhibition on the city's power to contract rates, if such power to contract can be necessarily implied from the power to contract for the supply of water; and our conclusion is that the right of the city to fix maximum rates, if not expressly given, arises by necessary implication from the language in which the charter power to contract is clothed."

The language of the charter of the city of Bessemer, conferring on it power with relation to water supply is:

"The mayor and aldermen of the city of Bessemer shall have full and ample power, jurisdiction and authority * * * to make, erect and repair public wells, cisterns, and establish fire plugs and hydrants, and to make all needful provisions by contract, ownership of waterworks, or otherwise, for the supply of the city and citizens thereof with water." 152 Ala. 398, 44 South. 664.

It differs from the language of the defendant's charter, conferring the same power, only in that the words "by contract, ownership of waterworks or otherwise," after the words, "to make any needful provisions," and the words, "and the citizens thereof," after the words, "for the supply of the city" do not appear in the charter of the defendant. In view of the repeated decisions of the Alabama Supreme Court that power to contract a supply of water is implied from the power conferred "to make all needful provisions for the supply of the city with water," though the method by contract is not expressed therein, it is clear there is no difference in legal effect between the two charters by reason of the omission of those words from that of defendant. In spite of the omission, defendant had the charter power to contract for its water supply as much as did the city of Bessemer. In the former charter the power is held to arise by necessary implication; in the latter, it was expressly set out. So the omission of the words, "and the citizens thereof," from defendant's charter does not make it differ in legal effect from that of the city of Bessemer.

A supply of water for a city includes a supply for the consumption of its citizens, as well as that for municipal purposes exclusively. In the case of Livingston v. Pippin, 31 Ala. 542, 550, 551, the Alabama Supreme Court said:

"The intendant and council of the town of Livingston have the ordinary public powers which are conferred on municipal corporations. The express grants of power are copied in the opening of this opinion. Nothing is more important, as a sanitary and police regulation, than an abundant supply of water. Its uses are too well known to require notice here. We hold that the

corporate authorities had the power, as such, to procure water on the public square of the town of Livingston."

In the case of Bessemer v. Waterworks, the Alabama Supreme Court held that a municipal corporation, with express or necessarily implied legislative authority to contract for a supply of water, could fix absolute and continuing rates for the contract period which it could not afterwards alter without the consent of the water company, the function being proprietary and not governmental. In the Bessemer charter power to so contract was expressed. In defendant's the Alabama Supreme Court has held it to be implied. As the charter powers of the defendant are therefore legally identical with those of the city of Bessemer, with relation to contracting for a water supply for the city, it follows that as the Supreme Court of Alabama has held that the city of Bessemer had the charter power to contract with a water company for fixed and absolute rates for a period of 30 years, the defendant had the like power under its charter, if the Alabama decision is followed. The decisions of the courts of that state with reference to the charter powers of a municipal corporation created by it should be controlling on this court.

The practical construction given the charter by the public and the parties concerned leads to the same conclusion. While it was in force, the Legislature in 1885 (Laws 1884–85, p. 415) incorporated the plaintiff by special act, for the purpose of contracting to supply the defendant city with water. Contracts of the same nature had been previously made under like authority with one Daniels and with the Elyton Land Company. These contracts all provided, not only for the supply of water needed by the city for its own purposes, but for the necessary supply for its citizens. The contract of June 2, 1888, has been repeatedly before and construed by the courts of Alabama, including its court of last resort. It has been thus impliedly recognized by them and the litigants as a valid contract. No question has ever been raised during a period of 25 years, as to the authority of the defendant to execute the contract. Both parties to it and the citizens have, for that length of time, regarded it as a legally executed agreement, observed it and acted upon it as such. The plaintiff has expended large sums since it was executed upon the faith of this recognition of its validity. Upon the one occasion upon which its binding force was assailed for any reason, it was not upon the ground of want of authority in defendant to execute it, but solely because the period of its duration was claimed to be too uncertain to admit of its enforcement. The chancery court determined that question against the city, and no higher court was called upon to pass upon it. This history of the contract from its inception and of the litigation regarding it, if resort can be had to it for that purpose, affords persuasive evidence of the practical construction given the charter by the Legislature, by the city and its citizens, and by the plaintiff during a period of 25 years. To now determine that a contract that has been publicly recognized as valid, and acted upon as subsisting during all that period never had any legal existence, would have an unsettling effect that would be unfortunate in the administration of the law, and one that is to be avoided unless de-

manded by imperative rules of construction. No such necessity exists. The federal decisions sustain the conclusion reached. Among them are the following: Omaha Water Co. v. City of Omaha, 147 Fed. 1, 77 C. C. A. 267, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614; Vicksburg v. Vicksburg Water Co., 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155; Detroit v. Detroit Citizens' Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592.

The power of the city of Birmingham in June, 1888, to make a contract with plaintiff, and to fix absolute rates during its existence, being established, the question then arises whether the defendant has in fact made a contract with plaintiff which fixes absolute water rates, and, if so, whether as to that feature of it, it has so definite a duration as to be enforceable.

The contract of June 2, 1888, provides for the payment of rates by consumers upon two bases. For domestic consumption, what is called a flat rate is employed for dwellings, closets, and bathtubs only, varying with the number of rooms, baths, etc., in each dwelling. For all other purposes a meter rate, measured by actual consumption, is employed, varying in price with the amount of daily consumption. Section 12 of the contract fixes the rates. Its language is, "Be it further ordained—that from the first day of July, 1888, the domestic rates for water furnished under this contract to the citizens of Birmingham shall never exceed the following rates viz. [setting out the schedule of flat rates]"; again, "The company shall have the right to charge for water by measurement at rates not exceeding the average rates named below. Measured water will be charged as follows." Here follows the schedule of meter rates per thousand gallons consumed, and the schedule of annual rents for the meters themselves.

The language of the contract, so far as it relates to flat rates, is fully as consistent with the intention to establish maximum rates as it is to establish absolute rates; and is as much a prohibition upon the water company to exceed during the term of the contract the schedule of flat rates, as it is an authority conferred upon it to charge such flat rates. If it was a limitation upon the water company only, then its effect was only to fix maximum rates, and it was open to the city, during the term of the contract, and without impairing its obligation, to fix rates lower than the maximum, provided they were reasonable and not confiscatory. This is defendant's contention as to the proper construction of the contract, and, looking alone to the language fixing the flat rates, it is a persuasive one. The plaintiff's contention is that the effect of the clauses, relating both to flat rates and meter rates is to fix absolute rates, not to be deviated from without its consent by the city during the life of the contract. As between these differing constructions, the solution of the question depends.

Supporting the defendant's contention are the cases of Georgia R. R. Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377; Knoxville Water Co. v. Knoxville, 189 U. S. 434, 23 Sup. Ct. 531, 47 L. Ed. 887; Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655, 32 Sup. Ct. 389, 56 L. Ed. 594; and State ex rel. Ferguson v. Birmingham Waterworks Co., 164 Ala. 586, 51 South. 354, 27 L. R. A. (N. S.) 674, 137 Am. St. Rep. 69, 20 Ann. Cas. 951. Supporting plaintiff's

contention are the cases of Bessemer v. Waterworks, 152 Ala. 391, 44 South. 663; Vicksburg v. Vicksburg Water Co., 206 U. S. 496, 27 Sup. Ct. 762, 51 L. Ed. 1155; Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102; Detroit v. Detroit Citizens' Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; and Omaha Water Co. v. Omaha, 147 Fed. 1, 77 C. C. A. 267, 12 L. R. A. (N. S.) 736, 8 Ann. Cas. 614. The inquiry is whether this case comes within the former or latter line of cases.

In the case of Knoxville Water Co. v. Knoxville, supra, a case in which the contract was construed to fix maximum and not absolute rates, the Supreme Court said, after having reached that conclusion, on page 437 of 189 U. S., page 532 of 23 Sup. Ct. (47 L. Ed. 887):

"We do not mean that under other circumstances words which on their face only express a limit might not embody a contract more extensive than their literal meaning. Detroit v. Detroit Citizens' Street Ry. Co., 184 U. S. 368 [22 Sup. Ct. 410, 46 L. Ed. 592]."

It thus appears that the language employed, while persuasive, is not conclusive. It may bear either one of the two constructions according to circumstances. The intention of the parties is to be arrived at not alone from the language of the particular clause fixing the rates, but from the entire contract, from the place the rate clause occupied in the contract with relation to the imposition of obligations on the respective parties, from the situation of the parties to the contract, and the circumstances surrounding them at the time it was executed.

Distinguishing the Knoxville Case from the Detroit Case, the Supreme Court said in the Knoxville Case:

"But in that case the rate was fixed by an ordinance which was the language of the city; the ordinance was under a statute which declared that the rates should be established by agreement between the city and the railway company, and neither statute nor ordinance reserved a power to the city to alter rates."

The language of the clause fixing rates in the Knoxville Case was "said company will supply private consumers with water at a rate not to exceed five cents per 100 gallons." 189 U. S. page 436, 23 Sup. Ct. 531, 47 L. Ed. 887. That of the clause fixing rates in the ordinance in the Detroit Case was "the rate of fare for any distance shall not exceed five cents in any one car, or any one route named in this ordinance, except where cars or carriages shall be chartered for specific purposes." 184 U. S. 375, 22 Sup. Ct. 413, 46 L. Ed. 592. The language of the ordinance in this case is "that from the first day of July, 1888, the domestic rates for water furnished under this contract to the citizens of Birmingham shall never exceed the following rates."

The language of the clause in the case at bar is that of the city, as it was in the Detroit Case. The clauses imposing duties upon the respective parties are intermingled in the contract under construction. The first nine impose duties on the water company. Sections 10, 11, 14, and 15 confer rights on the water company. Section 13 is neutral, imposing reciprocal rights and duties. Any significance that is to be deduced from the position of the clause in the contract ordinance in

the case at bar would seem to be in favor of the same construction reached by the Supreme Court in the Detroit Case.

The other distinguishing fact stated by the court in the Knoxville Case was the reservation of a power to the municipal corporation by the law of its creation to regulate rates, and the absence of a reservation to alter rates in either statute or ordinance in the Detroit Case. Of this the court said (189 U. S. 437, 23 Sup. Ct. 532, 47 L. Ed. 887):

"The ordinance was under a statute which declared that the rates should be established by agreement between the city and the railway company, and neither statute nor ordinance reserved a power to the city to alter rates. In the present case it seems to us impossible to suppose that any power to contract which the city may have had was intended to be exercised in such a way as to displace the municipal power expressly reserved or given by the general law under which the water company was created. It would require stronger words than those used here to raise the question whether, under the statute in force, the city could do it if it tried."

In the Detroit Case, 184 U. S. 385, 22 Sup. Ct. 417, 46 L. Ed. 592, the court said:

"It is plain that the Legislature regarded the fixing of the rate of fare over these street railways as a subject for agreement between the parties, and not as an exercise of a governmental function of a legislative character by the city authorities under a delegated power from the Legislature. It was made a matter of agreement by the express command of the Legislature."

And the court said:

"Coming to a consideration of the effect of the language of the ordinance, we think it amounted to a contract as to rates of fares."

Referring to the case of City Ry. Co. v. Citizens' St. Ry. Co., 166 U. S. 557, 17 Sup. Ct. 653, 41 L. Ed. 1114, the court further said (184 U. S. 387, 22 Sup. Ct. 418, 46 L. Ed. 592):

"Although in that case there was no provision in the statute directing that the rates of fare should be established by agreement, yet nevertheless it was held that the language used amounted to an agreement upon the subject-matter which could not be altered during its continuance by either party."

Of the language of the ordinance the court then said (184 U. S. 389, 22 Sup. Ct. 418, 46 L. Ed. 592):

"Nor does the language of the ordinance, which provides that the rate of fare for one passenger shall not be more than five cents, give any right to the city to reduce it below the rate of five cents established by the company. It is a contract which gives the company the right to charge a rate of fare up to the sum of five cents for a single passenger, and leaves no power with the city to reduce it without the consent of the company."

Coming to the instant case, the pertinent inquiry is whether the parties to the contract of June 2, 1888, contemplated a reservation to the city of the right to reduce rates by regulation below the schedules set out in the contract. There was no such express reservation in the ordinance itself. If it exists at all, it must be because section 12 is construed to fix maximum rates only, which is the question at issue. Nor does it appear that the city had at that time any power to regulate the rates of the public service corporations under its then charter. In the absence of charter power to regulate, the express or implied reservation of a general power to regulate in the ordinance would have

been unavailing to the city. The absence of the power in the city to fix rates by regulation would indicate the intention of the contracting parties, in view of the want of such power, that rates should be fixed by agreement; it being the only feasible way that they could be legally fixed in that event. It is not necessary that the Legislature should have expressly directed that method by agreement. When it appears that there was no other available way, and the Legislature did in fact authorize, both impliedly in its own charter and expressly in that of the plaintiff, a water supply to be procured by the city by agreement, the legislative intention that the rates should be fixed by agreement will be implied. The regulation of the rates of public service corporations, other than common carriers, had not attained the prevalence in 1888 that it since has. The customary way to fix rates then was by contract, rather than by regulation. This, and the absence of charter power in the city to regulate at the time the contract was made, are persuasive of the intent of the parties to the contract of June 2, 1888, that the rates should be fixed by agreement and not by regulation. A municipal corporation has no power of regulation, independent of statutory authority. In re Pryor, 55 Kan. 724, 41 Pac. 958, 29 L. R. A. 398, 49 Am. St. Rep. 280; Gas Co. v. State, 135 Ind. 49, 34 N. E. 702, 21 L. R. A. 734; St. Louis v. Telephone Co., 96 Mo. 623, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370.

In the case of Cedar Rapids Gas Co. v. Cedar Rapids, 223 U. S. 655–667, 32 Sup. Ct. 389, 390 (56 L. Ed. 594), the court said:

"We are of opinion that there was no contract on the part of the city that the price should be kept high enough to allow a discount for prompt payment. The general power reserved to regulate rates was limited only by the fourteenth amendment. The words relied upon by the plaintiff express its promise in consideration of the privileges granted, not a promise by the city. Knoxville Water Co. v. Knoxville, 189 U. S. 434, 437 [23 Sup. Ct. 531, 47 L. Ed. 887]. It is true that the ordinance was drawn as a contract, to be accepted, and it was accepted, by the plaintiff; it contained reciprocal undertakings, the one in question being that of the plaintiff, as we have said, and it was subject to the power retained by the city to regulate rates. That power, it was expressly provided by the Iowa statute, was not to be abridged by ordinance, resolution, or contract. Code 1897, § 725, Acts 22d Gen. Assem. (1888) c. 16."

The ordinance in this case is to be distinguished from that construed in the case cited in two respects. The pertinent language of the ordinance in this case is not unmistakably that of a promise on the part of the water company. It is, at least, equally consistent with the idea that it imports a promise on the part of the city. Again, and more important, in the Cedar Rapids Case the court said, "It is admitted that under the laws of Iowa the rate could be changed by the city," i. e., in the absence of a binding contract; and, again, "And it [the contract ordinance] was subject to the power retained by the city to regulate rates. That power, it was expressly provided by the Iowa statute, was not to be abridged by ordinance, resolution, or contract." Not only was the power to regulate expressly conferred, but its abridgment prohibited. In the case at bar, no power was retained in the ordinance by the city to regulate water rates, and no such power con-

ferred upon the city by its charter. In this controlling fact this case differs from the one cited.

In the case of Cleveland v. Cleveland City Ry. Co., 194 U. S. 517–536, 24 Sup. Ct. 756, 763 (48 L. Ed. 1102), the Supreme Court said, referring to the following language of the ordinance, "that for a single fare from any point to any point on the line or branches of the consolidated road no greater charge than 5 cents shall be collected":

"In reason the conclusion that contracts are engendered would seem to result from the fact that the provisions as to the rates of fare were fixed in ordinances for a stated time, and no reservation was made of a right to alter; that by those ordinances existing rights of the corporation were surrendered, benefits were conferred upon the public, and obligations were imposed upon the corporation to continue these benefits during the stipulated time. When, in addition, we consider the specific reference to limitations of time which the ordinances contained, * * * we can see no escape from the conclusion that the ordinances were intended to be agreements binding upon both parties definitely fixing the rates of fare which might be thereafter charged. Taking all the circumstances above referred to into account, the case before us clearly falls within the rule, as to the binding character of agreements respecting rates, applied in Detroit v. Detroit Citizens' Ry. Co., 184 U. S. 368 [22 Sup. Ct. 410, 46 L. Ed. 592], and approvingly referred to in Knoxville Water Co. v. Knoxville, 189 U. S. 434–437 [23 Sup. Ct. 531, 47 L. Ed. 887]."

In the case of Vicksburg v. Vicksburg Water Co., 206 U. S. 496–509, 27 Sup. Ct. 762, 766 (51 L. Ed. 1155), the Supreme Court thus quoted approvingly the language of the Supreme Court of Mississippi, and reached the conclusion, as did that court, that an ordinance couched in language appropriate for a maximum rate "put the rate beyond legislative or municipal alteration to the prejudice of the other contracting party":

"We decline to follow the decision in Griffin v. Goldsboro Water Co., 122 N. C. 206, 30 S. E. 319, 41 L. R. A. 240, in holding that while a water company which accepts an ordinance by which a maximum rate is fixed is bound, and cannot exceed the same, because of its contract, yet such rates are not binding upon consumers, who have a right to litigate against unreasonable charges."

In the case of Omaha Water Co. v. Omaha, 147 Fed. 1–13, 77 C. C. A. 267, 279 (12 L. R. A. [N. S.] 736, 8 Ann. Cas. 614), the Circuit Court of Appeals for the Eighth Circuit, construing similar language to that here involved in an ordinance of the city of Omaha, said:

"Did the city make such a contract? The stipulation concerning these rates is not embodied in the agreement for hydrant rentals which followed the ordinance of 1880. But the city required the contractor, as a qualification to receive the contract, to accept the terms and conditions of the ordinance, and an accepted ordinance is a contract. The ordinance was an offer by the city of the terms and regulations under which it would enter into a contract for the construction and operation of the waterworks. The city prepared and passed the ordinance. All its terms and words were the language of the city. It was enacted under a statute which empowered the city to agree upon the water rates. It prescribed specific rates for the use of water by private consumers, and provided that the water company should furnish water to them at such rates as should be agreed upon between the water company and the consumers, not exceeding those specified in the ordinance. The concession is readily made that the acceptance of this ordinance constituted a contract by the water company to furnish the water to private consumers at prices not exceeding those named in the ordinance. The contention is that it left the city free to reduce them. If so, the contract permitted the city to retain the

power to withdraw from the water company all the substantial benefits of its undertaking, for a reduction of the rates to private consumers would diminish the most substantial part of its revenue, and might ruin the company. It cannot be that either the city or Locke intended to make an agreement of this nature, for such a transaction would be contrary to the ordinary course of action of rational men under similar circumstances. The chief object of the city in the procurement of this contract was a supply of water. The great desideratum of the contractor was remunerative rates from private consumers. The presumption is that the contract secured both, for both parties consented to it. Nor is it doubtful that this was its effect when its terms are fairly read."

In the case of Georgia R. R. Co. v. Smith, 128 U. S. 174, at page 181, 9 Sup. Ct. 47, at page 49 (32 L. Ed. 377) the rate clause was found in the legislative charter of a railroad company, as a condition to the exercise by it of the exclusive rights of transportation over its lines. Its effect was to grant that right so long as certain rates were not exceeded. Of it the Supreme Court said:

"If considered as a condition to the enjoyment of the exclusive right designated, then the section only provides that, so long as the maximum rate specified is not exceeded, the company or its lessee shall have the exclusive right to carry passengers and merchandise over its roads. It contains no stipulation, nor is any implied, as to any future action of the Legislature. If the exclusive right remain undisturbed, there can be no just ground of complaint that other limitations than those expressed are placed upon the charges authorized. It would require much clearer language than this to justify us in holding that, notwithstanding any altered conditions of the country in the future, the Legislature had, in 1833, contracted that the company might, for all time, charge rates for transportation of persons and property over its line up to the limits there designated."

Distinguishing this case from the Detroit Case, 184 U. S. 388, 22 Sup. Ct. 418, 46 L. Ed. 592, the Supreme Court, in the latter case, said:

"And it was not thought that in the exercise of the merely governmental function of creating a charter and incorporating the Banking & Railroad Company the Legislature had in regard to this particular matter of rates surrendered the right to alter the maximum charges. The language used was regarded as a mere delegation of authority by the Legislature to the company to make those charges till the authority was altered or withdrawn. In other words, the language did not constitute a contract or agreement between the parties, the Legislature and the railroad company. In the case at bar * * * the rates are fixed under the provision of a statute which declares they shall be so fixed by agreement between the parties. * * * It may very well be that the language used by a Legislature in conferring authority upon a company to fix certain charges for fare might not be regarded as amounting to a contract, when the same language used by the parties in fixing rates under a legislative authority and direction to agree upon them would be regarded as forming a contract because the statute provided specially for that mode of determining them."

The same features that distinguish the Smith Case from the Detroit Case prevent it from ruling this case.

In the case of Bessemer v. Bessemer Waterworks Co., 152 Ala. 391, 44 South. 663, the Supreme Court of Alabama expressly held that an ordinance, the language of which was appropriate to fix maximum rates only, was a contract giving the water company the right to maintain such maximum rates as against a subsequent ordinance reducing them without its assent, without proof that the reduced rates were confiscatory. It is true that the specific language of the ordinance is not set

out in the opinion, but it is quite clear from the language of the court, and its reference to the Omaha Case quoted from, that it was of substantially like effect to that of the ordinance in this case. The language of the Bessemer municipal charter contained a provision that the rates at which water was furnished should be reasonable, thus conferring on Bessemer a right of regulation which Birmingham did not have under its charter at the time the contract of June 2, 1888, was executed. So that the facts of the Bessemer Case are not as strong as are those of this case.

Nor can it properly be said that the case of State ex rel. Ferguson v. Birmingham Waterworks Co., 164 Ala. 586, at page 590, 51 South. 354, at page 355 (27 L. R. A. [N. S.] 674, 137 Am. St. Rep. 69, 20 Ann. Cas. 951), conflicts with the Bessemer Case in this respect. It is true the Justice who wrote the opinion in that case said:

> "The maximum rates provided for in the ordinance contract in the instant case were fixed for the protection of the public against the exaction of unreasonable charges. * * * There is no indication of a legislative purpose to declare that the maximum should also be the minimum rates. Nor does any reason suggest itself why the water company may not establish a uniform rate less than the maximum fixed by the ordinance contract, or a rate less than reasonable, if such a thing be imaginable."

The question in that case did not concern the forced reduction of rates, but related solely to discrimination and the right of the water company to voluntarily reduce rates below the maximum to one patron without reducing them to all. The court held that the water company could voluntarily make a lower rate than the maximum to one patron, and could not thereby be forced to accord the same rate to its other patrons. It is clear that the question as to whether the supposed maximum rates were absolute rates, or whether they bound the company only, and as to whether the city could reduce the contract rates, by showing that lower rates were reasonable, to such lower and reasonable rates in spite of the ordinance, was not involved, and if anything was said bearing upon that, it was dictum. The only germane inquiry in that case related to the right of the water company to make a voluntary reduction from the contract rates to some patrons only, and to discriminate between patrons by so doing. If the language of the Bessemer ordinance was in substance the same as that of the contract of June 2, 1888, as appears to be true from the report of the Bessemer Case, that case is controlling, as against the dictum in the Ferguson Case, and should be departed from with reluctance by a federal court in construing a contract which is based on local legislation in the shape of a municipal ordinance.

The contract of June 2, 1888, prescribed two classes of rates, the flat rates for dwellings and their accessories and the meter rates for other purposes. The language of the flat rate clause has been stated. As to meter rates, the contract says:

> "The company shall have the right to charge for water by measurement at rates not exceeding the average rates named below. Measured water will be charged as follows."

The city concedes that this is language sufficient to establish absolute rates as distinguished from what are usually termed "maximum rates."

No reason appears for providing as to the flat rates merely a maximum, when the charges provided in the contract for measured water are on a basis of absolute rates. The Supreme Court of Alabama has held that all water furnished, except for dwellings, water-closets, and bath-tubs, is to be furnished by meter rates, and meter rates consequently apply to all water used for other purposes, even that for other domestic purposes and in the smallest quantities. Smith v. Birmingham Waterworks Co., 104 Ala. 315–323, 16 South. 123; Birmingham Waterworks Co. v. Birmingham (Ala.) 42 South. 10. As there seems to be no valid reason for putting flat and meter rates on different basis, as the meter rates are conceded to be absolute and not merely maximum, and as the language as to flat rates is susceptible of either of two constructions, the legitimate conclusion is that the flat rates are also absolute rates.

[7] Taking into consideration the state of development of rate regulation when the contract of 1888 was made, the absence of statutory authority at that time to regulate rates, the then prevalence of the method of fixing rates by agreement rather than by regulation, and the conceded fact that meter rates were so fixed in the contract, I think the parties, at the time the contract was entered into, intended by it to fix absolute rates as to both classes. It has been so treated since its execution by the parties. As late as 1898, when the right of the water company to the contract rates was questioned by the city in the Jefferson county chancery court, it was upon the ground that the 30-year term did not apply to the rate provision, and not that the rate clause fixed maximum rates only. The parties to the contract at the time of its execution, and during all the intervening time, evidently understood that the rates fixed were absolute rather than maximum, since, though the purpose to avoid the contract rates has long existed on the part of the city and its citizens, it has, for the first time, so recently, been sought to be accomplished upon this ground.

[8] If the contract of June 2, 1888, fixed absolute rates, did it do so for a fixed period of 30 years? This was the question presented in the case of Birmingham Waterworks Co. v. Mayor and Aldermen of Birmingham, decided in the Jefferson county chancery court in January, 1899, adversely to the contention of the city that there was no definite duration for the rate fixing clause. Section 14 is the only section of the contract which prescribes a specific period for its operation. That section provides that the city shall be obliged to use and pay for hydrants for a period of 30 years. However, there are other sections which imply the existence of a contract period without specifying its duration. Such are section 11, which contains the words, "during the existence of this contract"; section 18, which exempts the water company from liability from interruption of service from unavoidable accident, unnecessary unless the service was contracted to be provided for a definite term; section 19, which authorizes the purchase of the plant by the city "at the expiration of this contract," which in itself implies a definite duration for the contract; and section 22, which provides that the license tax against plaintiff shall remain the same "during the existence of the contract above named." In the case of Mayor & Aldermen of Birmingham v. Birmingham Waterworks Co.,

139 Ala. 531, 36 South. 614, 101 Am. St. Rep. 49, the opinion states that it was stipulated by the parties that the city had power to contract for a supply of water when it made the contract of June 2, 1888, and that upon the faith of it the water company expended a large amount of money in building a waterworks system; that the only question presented was whether section 22 of the contract was valid; that section 14 of the contract provided that "the term of the contract was for thirty years." The city questioned the validity of section 22 only because it contended that it was not competent for the city to barter away its future taxing power for a term of 30 years, and not because the contract had no fixed duration except as to the obligation of the city to pay for hydrants. The Supreme Court decided the case adversely to the water company only upon this ground. If the only term of the contract to which the 30-year period applied was the obligation to pay for hydrants, this would have been a complete answer to the contention of the water company that its license could not be raised by the city during the period of the contract—30 years. It was only upon the assumption that the 30-year period applied to section 22 of the contract that there could have arisen any occasion for the decision of the question involved in the litigation. The city, the water company, and the court certainly regarded the 30-year term as applying to the section providing the constant license. The city also acquiesced in the adverse ruling of the chancellor in the case in the chancery court upon this very question, to the extent at least of not causing it to be reviewed in the court of last resort. The decisions of many other cases in the Supreme Court of Alabama, involving the contract, can only be reconciled upon the idea that the parties and the court regarded other provisions than the obligation to pay for hydrants as being subject to the contract period of 30 years, since otherwise the questions decided in those cases would have been abstract, in view of the unenforceability of the contract because of the uncertainty of its duration. The conduct of the parties and the history of the litigation arising out of the contract should settle all doubt as to the duration of its provisions, if any existed.

[9] Having reached the conclusion that the city had power to and did enter into the contract of June 2, 1888, and that, properly construed, its effect was to fix absolute and not merely maximum rates, and to fix them for the contract period of 30 years, the remaining question is whether the ordinance 97C of the present city commission, assented to by the water company, had been substituted for the original contract. This depends upon whether it was subject to the referendum provided for by section 8 of the act of the Legislature of Alabama approved March 31, 1911, under which the present municipal government of the defendant is established.

The people rejected the ordinance when referred to them, and if the referendum provided by section 8 of the act applied to the ordinance, it was thereby abrogated. That section provides that "no grant of any franchise or lease or right of user, or any other right in, under, along, through, or over the streets, public highways, thoroughfares, or public property of any city" shall be made, nor shall any such rights of

any kind whatsoever be conferred upon any person, firm, or corporation except in the method prescribed, which includes a reference to the vote of the citizens.  It also provides:

"Nor shall any extension or enlargement of any such rights or power previously granted be made or given except in the manner and subject to all the conditions herein provided for as to the original grant of same."

It is under the authority of the latter clause that the city referred the ordinance 97C to the vote of the people.  The water company contends that the ordinance neither granted, enlarged, nor extended its rights in or to the use of the public streets or highways, and that it was not therefore subject to the referendum or affected by its result.

It must be conceded that the ordinance did not grant to the plaintiff any rights in the streets.  Its rights to use the streets had been previously conferred, and the later ordinance at most only affected the terms upon which they were to be thereafter used by the water company.  The city contends that the effect of the ordinance was to enlarge the rights of the plaintiff to use the streets, in that it permitted them to collect on the meter basis for all water furnished for all purposes, whereas before it could collect on that basis only for water not consumed in dwellings, water-closets, and bathtubs (Smith v. Birmingham Waterworks Co., 104 Ala. 315, 16 South. 123); and that this was a valuable privilege; and that the charges for water supplied through the pipes in the streets to the citizens was an inseparable part of the franchise granted the plaintiff by the city.  It would be a narrow view of section 8 that would confine its operation to ordinances granting rights to the physical occupancy and use of the streets, or to such as enlarged such rights of physical occupancy and user.  Municipal grants of franchises invariably contain clauses providing the consideration moving to the city from the grantee, and provisions for the remuneration of the grantee for the service agreed to be furnished by it to the citizens through the facilities made possible by the franchise.  Each of these elements is an essential part of the grant, as much so as is the consideration for a conveyance of property an element of a deed.  It is clear that a franchise to use the streets could be destroyed by a municipal ordinance, without actually taking away the right of user conferred on the grantee, by merely reducing the remuneration for the service being performed by it below the cost of performance.  Such an ordinance would be restrictive of the previous grant.  On the other hand and for the same reason, an ordinance which increases the remuneration for the service performed, but does not change the right to physically occupy the streets, must constitute an enlargement of the original grant.

The purpose of section 8 was to prevent the granting of franchises in terms onerous to the city or its inhabitants until the inhabitants were afforded an opportunity of ratifying or rejecting the proposed grant. If the narrow construction contended for by the plaintiff were given the section, it would be ineffectual to remedy the mischief.  It would be possible for the municipal government to grant a franchise upon adequate compensation agreed to be paid to it, and upon reasonable terms,

211 F.—33

for the service to be rendered its inhabitants under it, and, after the expiration of the 30 days in which the steps for a referendum are required by section 8 to be taken, to modify the grant so far only as concerned the compensation to be paid the city by the grantee for it, or the terms upon which the service was to be furnished the inhabitants under it, by making it more onerous to the city or its inhabitants, or both, without subjecting the modified agreement to the possibility of a referendum—if, as plaintiff contends, the modification be construed not to extend or enlarge the previous grant. The time would have elapsed for a referendum of the original grant, and the modification of it would not be of a nature to permit of a referendum. All opportunity for the people to reject the modified agreement would be denied by such a construction.

The plaintiff also contends that the ordinance 97C is less advantageous to it than the original contract of June 2, 1888, and hence cannot be considered to enlarge its rights as conferred by the original agreement. The question of benefit to the plaintiff under the new ordinance is a disputed one. If there is room for doubt as to the relative advantage the plaintiff may obtain from its provisions, it is not for the court to substitute its judgment for that of the city upon this question. The purpose of the referendum is to permit the people to determine this question for themselves, even as against the judgment of the city commission to whom its determination is entrusted primarily.

The plaintiff also contends that its franchise to use the streets came from the state and not from the city, and consequently the city could not, by its ordinances, grant any rights to use the streets, citing the case of Louisville v. Cumberland Telephone Co., 224 U. S. 649, 32 Sup. Ct. 572, 56 L. Ed. 934. It is true that the city, even though its consent was originally necessary to the grant, could not withdraw its assent, when once given, without the consent of the plaintiff to the withdrawal. It does not follow that if the governing body of the city and the plaintiff mutually agree on a modification of the original franchise, it is not competent for the Legislature in advance to provide that such modified agreement shall become effective only when ratified by a vote of the people; the effect of the rejection of the modified agreement being merely to leave the original franchise unimpaired and as it was granted by the state.

The franchise to use the streets, the consideration for it moving from the grantee to the grantor, and the terms upon which the inhabitants are to have the right to avail of the service agreed to be furnished by the grantee, are all essential and inseparable elements of the grant, and any modification of any terms of the original grant in these respects, which may make the exercise of the franchise more valuable to the grantee or more onerous to the city or its citizens, is an enlargement of the original grant to the use of the streets within the meaning of section 8, and subjects the modified agreement to the referendum therein provided for. The result is that the original contract of June 2, 1888, is still subsisting, and fixes the rates during its term, as provided in its schedules, for all purposes.

The application for the temporary injunction is granted, as prayed

for in the bill, upon plaintiff's executing a bond payable and conditioned according to law in the sum of $5,000, with sufficient sureties to be approved by the clerk of this court.