The plaintiff is a public-service corporation, with its principal office at Burlington. On 21 December, 1915, it entered into a contract with the defendant to furnish it electric power to operate and light its mills situated in the town of Graham at the rate of one cent per k. w. h. for electric energy. This contract was later modified by divers agreements to the basis of one and one-half cents per k. w. h. In September, 1921, the plaintiff wrote the defendant advising that on account of increased cost due to war conditions it would be necessary to raise the rate to two cents per k. w. h., and thereafter the bills were made out against the defendant at that rate. The defendant pleaded as a counterclaim all collected above the one and one-half cent rate which it had paid from November, 1918, to June, 1920.
At the close of the evidence, on motion of the defendant, the court directed a judgment of nonsuit as to the plaintiff's claim to recover the amount in excess of one and one-half cents, which excess the defendant had refused to pay after June, 1920.
The court charged the jury that if they found the facts to be as testified to by the witnesses they should answer against the defendant the issue on its counterclaim to recover back the excess above one and one-half cents which the defendant had paid on plaintiff's demand between November, 1918, and June, 1920. Judgment accordingly, and appeal by both parties.
The contract made between the plaintiff and defendant in December, 1915, stipulated a schedule of rates on a basis of one cent per k. w. h. This contract was to extend for five years from (329) 1 April, 1916, and thereafter until terminated by either party upon 6 months notice given in writing to the other. In October, 1917, the defendant agreed to increase this amount to be paid by .003 (three mills) per k. w. h. for 6 months from 1 October, 1917. On 1 June, 1918, the defendant, in writing, agreed to pay for said electric current, in addition to the amount previously paid, the sum of .005 (five mills) per k. w. h. "only so long as the cost of New River or Pocahontas coal shall be more than $5 per ton f. o. b." The current was billed the defendant on this agreement at one and one-half cents per k. w. h. until 2 or 3 September, 1918. On that date the plaintiff wrote defendant a letter with a full statement of their expenses and financial condition, and said: "It is now necessary for us to arrange to increase our rate to our large customers to two cents per k. w. h., and to ask our lighting customers to pay us a surcharge of 30 per cent as long as present conditions prevail." After this, beginning in October or November, 1918, the plaintiff charged the defendant, and the defendant paid for current, at the rate of two cents per k. w. h. until June, 1920. In the spring of 1919 Mr. Williamson, active manager of defendant, advised plaintiff that he was "going to get power elsewhere at a lower rate than the two cents charged" by the plaintiff.
When the contract was made between the plaintiff and defendant in 1915, the defendant was operating its plant with power generated by steam, and upon the faith of that contract they scrapped and sold their steam plant. In June, 1920, the defendant notified the plaintiff that they would no longer pay for current for power in excess of one and one-half cents per k. w. h., and demanded repayment for all in excess of this sum, and this is the counterclaim set up in this action.
The plaintiff was under an absolute contract to supply the defendant with all the current it desired to use for 5 years from 1 April, 1916, at the rate specified. This sum was afterwards increased by consent to one and one-half cents per k. w. h., which sum was duly paid. "Where an electric light or power company, operating under a quasi- public charter, enters into an ordinary contract to furnish electricity for a given number of lights or for a given amount of power, the obligation as to the amount of power or light to be supplied must be construed and determined according to the general principles of contract, which, as a rule, are absolute." Turnerv. Power Co., 154 N.C. 135.
Under the laws of this State the plaintiff could have gone before the Corporation Commission and have made an application to raise its *Page 353 
rates. In re Utilities Co., 179 N.C. 161; Dry Goods Co. v. Public ServiceCo., 248 U.S. 372. This was not done, but the plaintiff arbitrarily notified the defendant that it had raised its rates to two cents per k. w. h.
The following agreement is set out in the record: "It is agreed between the plaintiff and defendant that if the plaintiff is (330) entitled to recover the difference between the one and one-half cents and the two cents demanded for power supplies by the Piedmont Company of the L. Banks Holt Manufacturing Company after June, 1920, that the amount sued for by the plaintiff is correct, and it is further agreed that if defendant is entitled to recover on his counterclaim for payments made for power from September, 1918, to June, 1920, in excess of the rate of one and one-half cents per k. w. h., then the amount set out in this answer as a counterclaim is the correct amount to which defendant is entitled."
The pleadings show that the defendants began, in July, 1920, to deduct from the monthly bills for current used by it the sum of one-half cent per k. w. h., paying to plaintiff one and one-half cents per k. w. h., and retaining the balance of one-half cent per k. w. h., and that the amount so retained by the L. Banks Holt Manufacturing Company amounts to $4,172.64; and this is the amount sued for as per the above agreement. On the other hand, the defendant claims as a counterclaim the difference between one and one-half cents and two cents for electric current which it paid without any agreement or by any order of the Corporation Commission from November, 1918, to June, 1920, amounting to the sum of $9,529.33.
The defendant asked the court to charge the jury: "If you should find from the evidence and by its greater weight that the defendant paid the difference between one and one-half cents and two cents for its electrical current in order to prevent the shutting down of its mill, and so as to continue operating same, then I charge you to answer the issue `Yes,' and to fix the amount at $9,529.33," which was refused, and the defendant excepted. The defendant further asked the court to charge the jury: "If you shall find from the evidence and by its greater weight that the defendant had no other source from which to obtain power to operate its mill, and that it paid the difference between one and one-half cents and two cents for the time that it did pay same in order to obtain power to operate its manufacturing plant, and in order to prevent the shutting down of the same, then I charge you to answer the issue `Yes,' and to fix the amount at $9,529.33."
The evidence as to whether the plaintiff could have made a profit, or even expenses, if the rate had not been raised by it above one and one-half cents is irrelevant and immaterial. The plaintiff was a public-service *Page 354 
corporation, and had made a contract extending for five years from April, 1916, at the rate of one cent per k. w. h., and then to terminate only upon six months notice. During the lifetime of that contract there had been modifications increasing the rate by agreement to one and one-half cents, but the plaintiff could not go beyond that (331) agreement except by order of the Corporation Commission.
The defendant scrapped its steam plant upon faith in the contract made in 1916 for five years, and later voluntarily assented to increase the price to one and one-half cents. If the demand for the extra one-half cent was paid under duress, "payment coerced under duress or compulsion, though not made in ignorance of the fact, may be recovered." Within this rule are payments of charges or exactions under apprehension on the part of the payers of being stopped in their business if the money is not paid. BrewingCo. v. St. Louis, 2 A. E., Anno. Cas., 821, and notes.
In Newland v. Turnpike Co., 26 N.C. 372, Ruffin, C.J., said: "It was, however, objected on the trial that although the money was not due to the company the plaintiffs could not recover it back because they had paid it without suit and voluntarily; but this objection counsel very properly abandoned here. The payment was not voluntary, that is, as payment of a debt admitted to be due and willingly made; but it was made as a means of obtaining a passage over the road for the mail which the plaintiffs were obliged to carry, and of keeping their property from being taken from them by duress; and so it was compulsory and without consideration."
In Lumber Co. v. R. R., 141 N.C. 191, it is said: "It is not necessary that at the time of payment there should be any protest. The nature of the business considered, the shipper does not stand on equal terms with the carrier in contracting for charges of transportation, and if the shipper pays the rates established in violation of law to the carrier rather than forego his services, such payment is involuntary in the legal sense, and the shipper may maintain his action for money had and received to recover back the illegal charge."
The manufacturing company had scrapped its steam plant and the Court must take judicial notice that at this time there was a chaotic condition in industry, so that it was practically impossible for the defendant to arrange for power elsewhere, and in view of the testimony that in 1919 the protest was so vigorous that the defendant was trying to get power elsewhere, and that in June, 1920, it positively refused to pay this price, the matter should be referred to the jury upon the instructions asked and refused whether the payment was made under duress or not. It was useless to protest, and the law does not require *Page 355 
the doing of a vain thing. Gerringer v. Ins. Co., 133 N.C. 417; Bateman v.Hopkins, 157 N.C. 474.
There was no duty upon the defendant to apply to the Corporation Commission, for it had an absolute contract by which the rates were fixed. The plaintiff was bound by those rates until relieved by the Corporation Commission.
In Public Service Co. v. Finishing Co., 178 N.C. 546, the public-service company applied to the Corporation Commission and (332) received permission to increase its rates in the corporate limits of Salisbury. The public-service company attempted to increase its rates beyond the limits of Salisbury to a customer whom it was under contract to serve at rates specified in the contract. The Court held that it could not do so, and that the contract was binding, and the Court in that case, in effect, held that the contract was binding until changed by the Corporation Commission. The exact question presented was decided in Power Co. v. Burditt Bros., in 1920, Public Utility Reports, 1921 B, 6, where the Court said: "It is suggested by the plaintiff that if the defendants felt aggrieved by the action of the plaintiff in raising the rate, their remedy was by complaint to the Public-service Commission, but it was not necessary for them to pursue that course. The contract rate was valid and binding upon both parties, but subject to revision by the public-service corporation, as the public good might require."
If this sum was not paid by agreement, then certainly it can be recovered back. An agreement to pay this sum would have been void unless there was some consideration, as the plaintiff was doing nothing which was not already under contract to do. The prayers for instruction should have been given, and the court should have left it to the jury to determine whether this sum was paid in order to prevent the shutting down of its mill. In refusing this instruction the judge in effect told the jury that there was not a scintilla of evidence that defendant had paid to keep from shutting down his plant and to prevent injury to his property.
There is, therefore, simply and purely a question of damages for breach of contract. The amount of such damages is settled by the agreement above set out, dependent upon the proposition of law. The sole issue in effect is whether the defendant, by not giving an earnest protest, acquiesced in the illegal demand from November, 1918, down to June, 1920; or whether, having scrapped its steam plant upon making this contract, it was forced to make the payment demanded under duress lest its plant might be closed.
It is very clear that the plaintiff's demand cannot be sustained and the court properly so charged, for after June, 1920, the defendant not *Page 356 
only protested, but absolutely refused to pay. We think that the two prayers of instruction asked by the defendant should have been given and the jury should have found whether the defendant made the payment of the extra one-half cent per k. w. h. between November, 1918, and June, 1920, by duress. If the answer is in the affirmative, the amount of that verdict is agreed upon as above stated. If the answer is in the negative, then the defendant will not be entitled to (333) recover anything. In refusing these instructions there was, in the defendant's appeal, error for which there should be a
New trial.
In the plaintiff's appeal the judgment of nonsuit should be
Affirmed.