**CITY OF HIGH POINT v. DUKE POWER CO.**

District Court, M. D. North Carolina.

Aug. 9, 1940.

Roy L. Deal, of Winston Salem, N. C., and G. H. Jones, of High Point, N. C., for plaintiff.

R. M. Robinson, of Greensboro, N. C., Roberson, Haworth & Reese, of High Point, N. C., W. B. McGuire, Jr., and W. S. O'B. Robinson, Jr., both of Charlotte, N. C., for defendant.

HAYES, District Judge.

This litigation arises over a controversy between the City of High Point and Duke Power Co. as to the rates properly charged against High Point for the electric energy supplied by Duke Power Co. The City of High Point entered into a written contract with the North Carolina Public Service Corporation dated March 17, 1925, expiring March 1, 1935, for electric energy for lighting purposes and municipal purposes at the rates therein specified. On November 1, 1932, six separate contracts were made (1 for each delivery point) modifying the rates of the old contracts for the remainder of the term. These rates were in accordance with the rates under Schedule 2 filed by Southern Public Utilities Company with the Utilities Commissioner of North Carolina on November 5, 1932, effective November 1, 1932. On December 13, 1934, Southern Public Utilities Co. entered into two contracts which reduced the rates in accordance with Schedule 2–A filed by Southern Public Utilities Co. August 8, 1934, effective September 1, 1934, which were the same as Duke Power Company's rates under Schedule 8–A. The Duke Power Co. owned all of the stock in the Southern Public Utilities Company and in the North Carolina Public Service Corporation.

The latter two contracts covered the delivery points from which the City resold current for lighting and commercial purposes. There was a clause that the contracts would be continued after March 1, 1935, from year to year with the option for either party to terminate it upon 60 days previous notice, at the end of the original term or at the end of any year thereafter. It was provided in the 1934 contract that the City could not resell for use on motors in excess of 5 horsepower.

On December 31, 1934, the City of High Point notified the Southern Public Utilities Co. of its termination of the contracts with their expiration on March 1, 1935. The notice also said: "After March 1, 1935 the City of High Point expects to continue the purchase of electric current from you upon a month to month basis upon such terms and conditions as may be mutually agreed upon between you and the City."

Southern Public Utilities Co. tendered contracts to the City on or about March 16, 1935, based on rates under Schedule 10 of the Duke Power Co. which contained clauses against resale on motors in excess of five horsepower, similar to the provisions in the contracts expiring March 1, 1935. The manager of the Power Co. submitted tabulations showing the City Manager that the City could save several thousand dollars if it entered into the contract in order to avail itself of the rates under Schedule 10 which rates were based upon a demand and energy charge, while the rates under the expiring contracts were based solely on an energy charge. The rates under these schedules were optional and it was more economical for some municipalities to take under Schedule 10 while others saved by taking under Schedule 2 and 8–A, the ones employed under the expiring contracts. The Southern Public Utilities Co. merged with the Duke Power Co. on May 1, 1935, although the merger was in process in March, 1935, but for purposes of this litigation we can treat the Duke Power Co. as being the responsible party on the one hand

and the City of High Point on the other hand.

The Power Co. had contracts with other municipalities under Schedules 2 and 8–A and 2–A and it uniformly charged all municipalities the rates under these schedules unless and until they signed a contract to take under Schedule 10. The Power Co. treated the schedules as optional and insisted that Schedule 10 could not be applied in the absence of a contract therefor. The City was unable for some time to determine which schedule would be more advantageous to it but after examining it and checking over the tabulations submitted to it by the Power Co., the City Manager decided that the rates under Schedule 10 would be more economical to the City and signified the willingness of the City to enter into contracts under Schedule 10 in the .same manner as that existing between the Power Co. and the City of Lexington, N. C. The general form of contract which the Power Co. filed with the Utilities Commissioner of North Carolina to be used under Schedule 10 contained no restrictions against resale nor did the contract between the Power Co. and the City of Lexington.

The conditions in High Point differed from those prevailing in any other city in North Carolina where the defendant furnished electric current. The Duke Power Company and its subsidiaries constructed and maintained a general distribution system for the sale of electric power in the City of High Point and for this purpose had an investment of approximately $500,000. The City of High Point had no system for the distribution of electric current for power purposes and had not been engaged in the sale of current for power, but it was engaged in the sale of electric current for lighting purposes throughout the entire City and purchased that current and current also for lighting its streets and for other municipal purposes.

The parties reached a deadlock and were unable to enter into a contract because the Power Co. would 'not enter into it without the restrictive clause and the City would not enter into it with the restrictive clause. In the meantime the City continued to use current as it had before for lighting purposes and for municipal purposes and for resale for lights. It did not resell for use on motors in excess of five horsepower. The Power Co. rendered monthly statements based upon the rates contained in the old contract and the City paid them from March 1, 1935, to April 23, 1938, in the aggregate amount of $448,405.90. The same electricity computed at the rate under Schedule 10 would have amounted to $368,163.98, a difference of $80,241.92. The plaintiff in August, 1937, started this action to recover the above amount.

Between April 23, 1938, and April 24, 1939, the Duke Power Co. sold and delivered to the City and rendered statements therefor at the rates set forth in the contracts of December 13, 1934, which amounted to $163,590.05 but the City has not paid any part thereof. If this power had been computed under Schedule 10 the City would be due $127,435.94. There is no controversy about the fact that the City is due the Power Co. $5,671.01 for miscellaneous power between April 23, 1938, and April 24, 1939. On April 28, 1939, the City tendered the Power Co. a check in the sum of $39,740.94 in full payment of accounts to and including March, 1939, which the Company refused to accept. The check would have been sufficient to cover the indebtedness if the plaintiff had not made the payments and if the rate under Schedule 10 had been in force since March 1, 1935, and had been the applicable rate.

The real controversy revolves around the legal right of Duke Power Co. to prohibit the City of High Point from the resale of the electric power on motors of greater than five horsepower.

The City contends that it was entitled to have current without restrictions on resale. It contends that the Duke Power Co. published Schedule 10 covering rates to municipalities and submitted forms of contracts both of which were approved by the Utilities Commissioner and that no provision appears upon either restricting a municipality from resale. Therefore the Power Co., it contends, unlawfully insisted on inserting the illegal provision in the contract which prevented the City from executing it and that it is entitled to have current under Schedule 10 in the same manner as those municipalities which purchased under written contract. The Power Co. refused to enter into a contract with the City of High Point unless Paragraphs 6 and 12 were included therein as follows:

Paragraph 6: "Lighting its streets and public and private buildings, and for other municipal purposes, and for resale to the inhabitants of the consumer for residential and commercial purposes." And in Para-

graph 12: "It is expressly understood and agreed that the consumer shall not sell or deliver the electric power delivered hereunder, or any part of same, to any consumer for any one motor in excess of 5 horsepower."

The Power Co. owned the John Leddy franchise. Under it the Company and its predecessors had installed the power distribution system above referred to. The City had confined its activities to resale for light and commercial purposes and for its municipal purposes. Nor had the Power Companies invaded the City's realm of sale for lights. The City granted franchise to Leddy which contained the right and provision to install and to maintain power plants, poles and wires in the City for the distribution of current for lights and power, but paragraph 16 contains this limitation: "That the said John Leddy, or his assigns, shall not sell electric lights or electric current in opposition to the City of High Point." The City now contends that this clause is a restriction against Leddy, or his assigns, selling current for power in High Point in opposition to the City. Whereas the Power Co. contends that the words "electric current" are used in apposition to the words "electric lights" and are synonymous terms. In this connection the evidence discloses that it was contemplated that an investment of between $200,000 and $300,000 would be necessary for the grantee of the franchise to enjoy the privilege therein provided and at that time the City was selling current for lights but current for power was furnished by private enterprise. If the City's construction is correct, the franchise would have been revocable at the pleasure of the City. Such a construction is contrary to business experience. The City officials could not expect an individual or Company to invest $200,000 or $300,000 on such a contingency and certainly business men would not enter upon such a hazardous undertaking.

Nor is such a position in accordance with law. Boise Artesian Hot & Cold Water Co. v. Boise City, 230 U.S. 84, 33 S.Ct. 997, 57 L.Ed. 1400; Northern Ohio Traction & Light Co. v. State of Ohio ex rel. Pontius, 245 U.S. 574, 38 S.Ct. 196, 62 L.Ed. 481, L.R.A.1918E, 865; Detroit v. Detroit Citizens' Street R. Co., 184 U.S. 368, 22 S.Ct. 410, 46 L.Ed. 592.

A strict construction of the entire franchise leads me to believe that the clause is a restriction against competition with the City in the business of supplying electric lights and has no application for the distribution of power for power purposes. The clause itself discloses the sense in which the word "or" is used here. Leddy or his assigns indicates that the word "assigns" is used in place of Leddy or in apposition to Leddy and the restriction against selling electric lights or "electric current" indicates a similar use of the words "electric current" as being synonymous with "electric lights" and that it is not intended for "electric current" to embody anything greater than electric lights. "Electric current" does not enlarge upon the term "electric lights" and the term "electric current" as used in this connection does not mean "electric current" for power. The terms are not alternative or enlarging but definitive of each other explaining more specifically the meaning of "electric lights". "Electric lights" is a term in common parlance applicable to any phase of a lighting system and is often applied to fixtures. As used here "electric lights" meant "electric current" for lights. Current for light and current for power purposes are quite different things and in the franchise they were used for different purposes. The restriction that the grantee could not sell "electric current" or "electric lights" in opposition to the City does not restrict the grantee from selling current for power purposes unless we construe the term "electric current" as being a limitation applicable to all purposes for which current might be used. If this had been the intention of the parties undoubtedly they would have employed appropriate language to such an intention. The word power does not appear in this clause although it does appear in the granting clause. If it had been the intention of the parties to prevent the grantee from selling power, they would have said: "Current for lights or power" or words of a similar import. The testimony shows also that "electric current", at the time the franchise was granted, meant "electric current" for lights and did not include current for power. It is proper for the courts to give effect to the meaning of trade terms when such a meaning is made clear to the courts. Glen Falls Indemnity Co. v. Apple & Bond Co., 4 Cir., 69 F.2d 695; Neal v. Camden Ferry Co., 166 N.C. 563, 82 S.E. 878; Hurst v. W. J. Lake & Co., 141 Or. 306, 16 P.2d 627, 629, 89 A.L.R. 1222; Sec. 235 of the Restatement on Contracts; Williston on Contracts, Sec. 653. It follows from what has been said that the Duke Power Co. had the right under the

franchise to sell "electric current" for power purposes in the City in accordance with the Leddy franchise, subject to the restrictions against selling current for lights in opposition to the City of High Point.

The necessary question which arises is whether the Power Co. is required to sell current without restricting its customers from competing against it in its legitimate field. Under the law of North Carolina it is well settled that one public service corporation can not be made to supply a competitor, another public service corporation of like character, with the material to enable the latter to discharge its duty to the public. A public service corporation must make available to the public its service and it meets the requirement when the service is made available. If it renders the service therefor it is under no obligation to extend that service to another public service corporation to compete with it. Holmes Electric Co. v. Carolina Power & Light Co., 197 N.C. 766, 150 S.E. 621. It seems to be the rule prevailing everywhere that where a public service corporation is adequately serving the public through its own facilities it can not be compelled to serve the same public through the facilities of a competitor, or to supply a competitor with the means of competition. Express Cases, 117 U.S. 1, 6 S.Ct. 542, 628, 29 L.Ed. 791; Evansville & H. Traction Co. v. Henderson Bridge Co., C.C., 134 F. 973; Rogers Iron Works v. Public Service Comm. of Missouri, 323 Mo. 122, 18 S.W.2d 420; Pacific Tel. & Tel. Co. v. Eshleman, 166 Cal. 640, 137 P. 1119, 50 L.R.A.,N.S., 652, Ann.Cas.1915C, 822; Atlantic Coast Line R. v. North Carolina Corp. Comm. 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398.

The Supreme Court of North Carolina in the Atlantic Express Co. v. Wilmington & W. R. Co., 111 N.C. 463, 16 S.E. 393, 396, 18 L.R.A. 393, 32 Am.StRep 805, said: "The railroad company performs its whole duty to the public at large, and to each individual, when it affords the public all reasonable express accommodations."

It held the railroad could not be made to furnish facilities for doing an express business over its line to one express company similar to the facilities furnished another express company.

The continued use by the City of High Point of current supplied by the de-fendant obligated the City to pay the lawful rates applicable to such a situation. Boise Artesian H. & C. Water Co. v. Boise City, 230 U.S. 84, 95-98, 33 S.Ct. 997, 58 L.Ed 1400.

N.C.Code, Sec. 1112 (4), requires defendant to file its rate schedules with the Commission and Sec. 1112 (5) requires it to charge rates in accordance with schedules filed with the Commission. At the termination of the contracts on March 1, 1935, the defendant had schedules 8-A and 2-A applicable to Cities electing to purchase current on an energy basis and a new Schedule 10 which was applicable to a city electing to take current on a demand and energy basis by entering into a yearly contract therefor. Schedule 10 did not supersede Schedules 2-A and 8-A. It seems to be the prevailing rule that "When once lawfully published, a rate, so long as it remains uncanceled, is as fixed and unalterable, either by the shipper or by the carrier, as if that particular rate had been established by a special act of the Congress." Central R. Co. v. Mauser, 241 Pa. 603, 88 A. 791, 792, 49 L.R.A.,N.S., 92. The North Carolina Code, Sec. 1112 (7), sets forth the procedure necessary to be followed in order that a new rate may have the effect of changing or superseding an existing rate. Schedule 10 was an optional schedule applicable to those municipalities entering into yearly contracts under it and municipalities have a right to continue to take electric current and power under the rates of Schedules 2-A and 8-A. The evidence conclusively shows that Schedule 10 was not applied by the defendant to any municipality in North Carolina unless such municipality entered into the written yearly contract therefor. It is significant that the City of High Point through its officials was in doubt for sometime whether Schedule 10 would be more advantageous to it than the schedules then applicable and since the City through its official action said that it elected to take the current on a basis from month to month, and such a basis was not provided for under Schedule 10, the power company was not exacting an unlawful rate by billing the City for the current under the Schedules 2-A and 8-A. There can be no doubt about the right of a Public Service Corporation to maintain optional schedules. Southeastern Land Co. v. Louisville Gas & Electric Co., 262 Ky. 215, 90 S.W.2d 1; Niven v. Consolidated Edison Co. of New York, 19

P.U.R.,N.S., 387 (1937 N.Y. Pub. Ser. Comm.).

■ But there is an insuperable obstacle to the right of the plaintiff to recover any part of the money paid the defendant. The City's position is that the rate charged is not a rate authorized by law and that a payment of an unlawful rate would not bar its right to recover it. But the rates charged are not illegal because they are in accord with schedules on file. The City has unfortunately taken the position that it could compel the defendant to give it a contract in the same language as that contained in the contract between the defendant and the City of Lexington, and if the defendant refused to enter into that contract, the City could have the same rate as if it had entered into it. However, the defendant submitted the bills under Schedules 2–A and 8–A and the City with full knowledge of all of the facts paid the bills as rendered. Under these circumstances the City is clearly not entitled to recover any of it. It is a settled rule that where a party with the knowledge of the facts, or where the means of knowledge or information is in the reach of the party paying, and he voluntarily makes a payment he can not recover any part thereof. Matthews v. Smith, 67 N.C. 374; Adams v. Reeves, 68 N.C. 134, 12 Am. Rep. 627; Devereux v. Rochester German Ins. Co., 98 N.C. 6, 3 S.E. 639; Brummitt v. McGuire, 107 N.C. 351, 12 S.E. 191; Bernhardt v. Carolina & N. W. R. Co., 135 N.C. 258, 47 S.E. 427; Piedmont Power & Light Co. v. L. Banks Holt Mfg. Co., 183 N.C. 327, 111 S.E. 623; Swift & Co. v. Columbia Ry. Gas & Electric, 4 Cir., 17 F.2d 46, 51 A.L.R. 983. The latter case is almost identical with the case here under consideration.

There is no evidence here of duress or compulsion and it is perfectly clear that the payments were voluntary. It is significant that with full knowledge of all of these facts and with this litigation pending since August, 1937, the plaintiff continued to make the payments until April 23, 1938. In the case of Pardue v. Absher, 174 N.C. 676, 94 S.E. 414, 415, the U. S. Fidelity and Guaranty Co. as surety for H. O. Absher, administrator, paid off a judgment which it claimed was invalid for want of service but it alleged that it was forced to pay the judgment to prevent revocation of its license to do business in the state. It paid the money into the Clerk's office and then enjoined the clerk from paying it out.

Chief Justice Clark speaking for a unanimous court said: "It is an 'elementary rule that unless otherwise provided by statute, a party cannot either by direct action, or by way of set-off or counterclaim, recover money voluntarily paid with the full knowledge of all of the facts, and without any fraud, duress, or extortion, although no obligation to make such payment existed.' 30 Cyc. 1298. This applies to voluntary payments by corporations (Id. 1300), and—'money voluntarily paid to satisfy a judgment which has not been reversed cannot be recovered back, and it is immaterial that the recovery was fraudulent. Payment of a judgment is voluntary unless made to procure the release of the goods of the party making the payment after seizure or to prevent their seizure by an officer armed with the authority or apparent authority to seize them.' Id. 1302. It can make no difference that afterwards the appellant alleged that it made payment to prevent a revocation of its license to do business in this state. It made no protest at the time, and the fact that it thought it was to its advantage to pay this judgment cannot vitiate the effect of the unrestricted payment in full of the judgment, without protest."

■ The City of High Point was acting in a private capacity as distinguished from a governmental capacity in purchasing electricity from the defendant which it was reselling for a profit. The exercise of its powers for the private advantage of the City is subject to the same rules that govern individuals and private corporations. Holmes v. Fayetteville, 197 N.C. 740, 150 S.E. 624; Asbury v. Albemarle, 162 N.C. 247-254, 78 S.E. 146, 44 L.R.A.,N.S., 1189. A city under such circumstances could not occupy a position more favorable than a county. It has been decided by the Supreme Court of North Carolina that a county which voluntarily pays a claim can not recover the fund in the absence of fraud or mistake. Commissioners of Catawba County v. George Setzer, 70 N.C. 426, 427; Board of Commissioners v. Board of Commissioners, 75 N.C. 240. So far as I can find, all decisions to the contrary are distinguishable on the ground that the payments were made under some form of duress or compulsion, as where a shipper is required to pay an unlawful rate in order to get his merchandise shipped as in the case of Hilton Lumber Co. v. Atlantic Coast Line R. Co., 141 N.C. 171, 53 S.E. 823, 6 L.R.A.,N.S., 825. Distinction is clearly

pointed out by Judge Parker in Swift & Co. v. Columbia Ry. Gas & Electric Co., 4 Cir., 17 F.2d 46, 51 A.L.R. 983.

The question remains whether the Power Company is entitled to recover on rates under Schedule 10 for the period from April 23, 1938, to April 24, 1939, or under Schedule 2–A. It has submitted bills for the current under Schedule 2–A, notwithstanding the fact that the City both before the institution of this action and by its complaint in this action has demanded of the defendant that the current be furnished under Schedule 10. As to this part it seems to me that the position of the parties is different. During the period in question no contract exists between the parties governing the rates to be applied. The old contracts were terminated on March 1, 1935. The City was demanding the application of Schedule 10, the defendant applied Schedule 2–A, for the reason that it could not grant Schedule 10 unless a yearly contract was entered into. It seems to me that it could just as easily take the same position in regard to Schedule 2–A, for Schedule 2–A applies only where a customer enters into a yearly contract. It seems therefore necessary for the court to determine which rate under the circumstances is reasonable and what rate the plaintiff ought to pay. Bearing in mind that the plaintiff was acting in good faith in its belief that it could not be required to sign a contract containing the requirements in Paragraphs 6 and 12 of the contracts submitted by the defendant, and that this constituted its only objection to the execution of the contract, the court is unable to see any valid reason why the court should compel the City to pay under Schedule 2–A. Right and justice seem to dictate that the defendant ought not recover under the higher rate under the circumstances of this case. In view of the fact that the City was ready, willing, able, and anxious to pay for the current in accordance with the rate under Schedule 10 which the defendant refused to accept, the defendant ought not be allowed to recover any interest.

A judgment will be entered to the effect that the plaintiff is not entitled to recover anything of the defendant, that the defendant is entitled to recover of the plaintiff the sum of $127,435.94 with interest from the date of the judgment, plus $5,671.01 for miscellaneous power with interest on this item from April 24, 1939.